IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES OF AMERICA

v.

HUMBERTO SANCHEZ-TAMAYO,
ISIDRO GOMEZ-PENALOZA,
JUAN CAMACHO-PINEDA,
EDD CROWELL, and
JESSICA WILLIS,

            Defendants.

CRIMINAL CASE NO.

1:10-CR-0532-JOF-JFK

## REPORT AND RECOMMENDATION

Pending before the court are: Defendant Humberto Sanchez-Tamayo's ("Sanchez") motion [Doc. 72] to suppress evidence seized from 1242 Bailing Drive, Lawrenceville, Georgia, on December 3, 2010, pursuant to a federal search warrant, and motion [Doc. 86] to suppress evidence seized off his person and any statements made as the result of the warrantless stop of a BMW in which he was an occupant on December 3, 2010; Defendant Isidro Gomez-Penaloza's ("Gomez") motion [Doc. 71] to suppress evidence seized out of the vehicle and off his person and any statements made as the result of the warrantless stop of a BMW of which he was the driver on

December 3, 2010, and motion [Doc. 87] to suppress evidence seized from 1242 Bailing Drive, Lawrenceville, Georgia on December 3, 2010, pursuant to a federal search warrant; Defendant Juan Camacho-Pineda's ("Camacho") motion [Doc. 64] to suppress evidence seized off his person and any statements made as the result of the warrantless stop of a BMW in which he was an occupant on December 3, 2010; Defendant Edd Crowell's ("Crowell") motions [Docs. 68, 69, 103] to suppress evidence seized from a warrantless stop of a F-150 truck which he was driving and statements he made in connection therewith on December 3, 2010, and motion [Doc. 105] for severance of Defendants; and Defendant Jessica Willis' ("Willis") motions [Docs. 70, 108, 129] to suppress statements that she made during a warrantless stop of a F-150 truck in which she was an occupant on December 3, 2010. Evidentiary hearings were held on the motions to suppress as related to the warrantless stops and searches on May 19 and 20, 2011, and on August 10, 2011.[1] [Docs. 115, 116, 123].

## Motions to Suppress - Warrantless Stops and Searches

With respect to the stop of the BMW, which Defendant Gomez was driving and in which Defendants Sanchez and Camacho were passengers, Defendants argue that there was not a sufficient basis to detain either the vehicle or them; therefore,

_____

[1]Citations to the transcripts for the hearings are: (Tr. at ).

Defendant Gomez challenges the seizure of any evidence from the vehicle and from his person, as well any statements he made, and Defendants Sanchez and Camacho challenge the seizure of any evidence from their persons and statements they made.[2] [Docs. 127, 128, 132]. The Government opposes the motions to suppress filed by these Defendants contending that at the time the BMW was stopped there was probable cause to arrest the Defendants and to search their persons and the passenger compartment of the vehicle incident thereto and, in the alternative, that the search of the vehicle was based on probable cause or as an inventory search.[3] [Doc. 135 at 44-50].

With respect to the stop and search of the F-150 truck, Defendant Crowell, after conceding that there was probable cause to effect a traffic stop, contends that the stop

---

[2]The Government advised that it does not intend to introduce in its case-in-chief any statements made by Defendants Sanchez, Gomez and Camacho. (Tr. at 41).

[3]The Government also raised issues regarding Defendants Gomez's and Crowell's legitimate expectations of privacy in the BMW and F-150 truck and regarding Defendants Sanchez's and Gomez's legitimate expectations of privacy in 1242 Bailing Drive. [Doc. 135 at 26, 28, 33-34, 47-49, 51-53]. However, acknowledging that the Government had not placed these Defendants on notice that there was a challenge to their legitimate expectations of privacy in the locations of the referenced searches prior to the filing of the Government's brief opposing the motions to suppress, the Government has withdrawn this ground as a basis for denying the motions to suppress. [Doc. 137].

3

exceeded the duration necessary for a traffic stop; that, after he withdrew consent (the voluntariness of which he does not challenge) to search the truck, he was unlawfully detained; and that there was not probable cause for the subsequent warrantless search of the truck. [Doc. 131]. Defendant Willis contends that any statements she made during the traffic stop should not be admitted because she was not advised of her Miranda rights and the statements were involuntary. [Doc. 129]. The Government opposes the motions to suppress arguing that the traffic stop was limited in duration, that once consent was withdrawn, there was a reasonable suspicion to continue the detention, and that there was probable cause for the search of the truck. As to Defendant Willis, the Government argues that she was not subjected to custodial interrogation and that her statements were voluntary. [Doc. 135 at 34-43].

I.    **Findings of Fact**

   a.    **Witness Credibility**

   Defendant Crowell focuses much of his challenge to his detention, after withdrawing his consent to search the F-150, and to the probable cause to search the F-150, which was based in large part on an alert by a certified K-9, on attacks on the credibility of the two Georgia State Patrol troopers participating in the stop, seizure and search. [Doc. 131 at 31-37]. Defendant contends that the troopers' testimony is

4

not credible because of inconsistencies and conflicts with other evidence, because the testimony exaggerated or misstated events observed on the video of the traffic stop, and because the troopers at times did not record the audio portion of the traffic stop. [Id.]. The court, having observed the testimony of all of the witnesses, finds the testimony as set forth *infra* credible. See United States v. Ramirez-Chilel, 289 F.3d 744, 749 (11th Cir. 2002) ("Credibility determinations are typically the province of the fact finder because the fact finder personally observes the testimony and is thus in a better position than a reviewing court to assess the credibility of witnesses."). In weighing the credibility of a witness, the court takes "into account the interests of the witnesses, the consistencies or inconsistencies in their testimonies, and their demeanor on the stand." Id. at 750; see also United States v. Wein, 2006 WL 2128155, at *3 (W.D. Pa. July 27, 2006) (noting that "customary techniques to ascertain the credibility of the witnesses" included, but was "not limited to: appearance and conduct of each witness, the manner in which he testified, the character of the testimony given, his intelligence, motive, state of mind, and demeanor while on the stand").

The court viewed the video of the traffic stop, including deploying the K-9 and the subsequent search, and reviewed the transcripts of the evidentiary hearing, all in light of having observed all of the witnesses testify, while carefully considering the

issues raised by Defendant regarding credibility. Recognizing that Defendant offered different explanations for certain events, drew different conclusions from events, and the court believes, misread or took out of context some of the testimony pointed to in making his arguments, the court simply did not find that the testimony of the troopers was materially inconsistent, materially conflicted with other evidence, or was intentionally misleading or exaggerated. And unless the evidence "'is contrary to the laws of nature, or is so inconsistent or improbable on its face that no reasonable factfinder could accept it" or unless the factfinder's determinations appear to be "'unbelievable[,]'" none of which the court believes is true of the testimony in this case, a reviewing court should accept those findings of fact. <u>Ramirez-Chilel</u>, 289 F.3d at 749 (citations omitted); <u>accord United States v. Griffith</u>, 397 Fed. Appx. 613, 617-18 (11th Cir. 2010).

The court has carefully considered all of the evidence and, for the purpose of ruling on the motions to suppress, finds the following facts established and relevant to resolution of those motions.

### b.    Facts

Drug Enforcement Administration ("DEA") Special Agent Darren Krawczyk, the case agent for this investigation, testified that on December 3, 2010, DEA agents

and Task Force Officers ("TFO") were conducting surveillance at 1242 Bailing Drive, Lawrenceville, Georgia, based on information obtained from court authorized wire intercepts being conducted by federal agents in South Carolina. (Tr. at 11-12, 28, 35; Gov't Ex. 1). According to Agent Krawczyk, the South Carolina investigation overlapped with another investigation he was conducting in Atlanta, and both involved an individual from South Carolina traveling to the Atlanta area to take delivery of quantities of cocaine. As a result, a location was identified where the drug transactions took place, and two individuals were arrested at the location and quantities of cocaine and methamphetamine were seized. (Tr. at 28-29). Thereafter, intercepted conversations on the South Carolina wiretap identified a person by the name of Beto and his cellular telephone number as the new contact for quantities of cocaine. (Tr. at 29-30). Investigating agents were able to use GPS tracking of the cellular telephones[4] used by Beto to identify 1242 Bailing Drive as his residence, due to the fact that the GPS in the cellular telephones used by Beto placed him in the residence in the late night and early morning hours. (Tr. at 30-33). The week of December 3, 2010, agents conducted trash pulls at the residence and obtained information corroborating the

---

[4]Agent Krawczyk explained that Beto regularly dropped (ceased using) a cellular telephone and obtained a new cellular telephone which the agents identified by the wire intercepts and toll record analysis. (Tr. at 30-33).

7

association of drug suspects with the residence.  (Tr. at 34).  Accordingly, the agents believed the location to be a stash house for cocaine and, on December 3, 2010, were attempting to obtain a federal search warrant for the location.  (Tr. at 35).

During surveillance on December 3, 2010, at 1242 Bailing Drive, TFO Leonard Purvines[5] was primarily tasked with keeping an eye on the residence and on individuals and vehicles coming to and leaving from the residence.  (Tr. at 55).  He arrived at approximately 7:00 a.m.[6]  (Tr. at 55).  At 11:45 a.m., he observed a gray BMW back out of the residence's garage and park on the street in front of the residence.  A Hispanic male, later determined to be Defendant Sanchez, exited the vehicle and entered the residence.  (Tr. at 57-58, 92; Gov't Ex. 4).  At 11:50 a.m., an orange Yukon arrived at the residence and parked on the street in front of the BMW, and a Hispanic male, never identified, exited and entered the residence.  (Tr. at 59-60; Gov't Ex. 5).  At 12:30 p.m., a black F-150 truck arrived at the residence, drove up the

---

[5]TFO Purvines, with seventeen years of law enforcement experience, was employed by the East Point Police Department and assigned, since 1998, to the DEA. (Tr. at 53).  He had conducted several hundred surveillances involving suspected drug activity, executed approximately thirty drug related search warrants, made hundreds of arrests for drug crimes and conducted thousands of interviews related to drug investigations.  (Tr. at 53-54).

[6]Until approximately 1:15 p.m., when the TFO was no longer stationary in front of the residence, the times he recorded were fairly accurate.  (Tr. at 56-57).

AO 72A
(Rev.8/82)

driveway as the garage door opened, and entered the garage as the garage door closed behind the vehicle. (Tr. at 60). TFO Purvines could not clearly see the two occupants of the truck due to the dark tinting on the windows. (Tr. at 60).

After approximately eight minutes, a Hispanic male, later identified as Defendant Camacho, exited the residence, entered the BMW, and drove out of the subdivision to a Walgreens on Riverside Parkway, where he parked the BMW. (Tr. at 61, 94; Gov't Exs. 6, 7). Surveillance agents parked in the same parking lot, observed the BMW and Defendant Camacho, who remained in the vehicle looking around. (Tr. at 62, 130). He then moved the BMW to another part of the parking lot and repeated the process of looking around. (Tr. at 63, 130). The agents determined that Defendant Camacho was conducting counter-surveillance, looking for any police presence entering into or leaving the subdivision.[7] (Tr. at 62-63, 67). At 12:40 p.m., the garage door to the residence opened and the F-150 backed out and left the subdivision. TFO Purvines directed other agents to follow the vehicle, and Georgia State Patrol ("GSP") troopers, who were staged nearby to assist, were asked to conduct

---

[7]TFO Purvines acknowledged that there were seven entrances into the subdivision and that the BMW's location did not allow for observation of all of those entrances, but he believed the most direct route into the subdivision to 1242 Bailing Drive was covered by observation from the Walgreens - the reason the agents had established surveillance at that location. (Tr. at 94-96).

9

a traffic stop of the F-150[8] because all of the observations "led agents to believe that this was a classic pick up - drop off narcotics and pick up by a second individual . . . a transaction had occurred" at a location believed to be a stash house. (Tr. at 36-38, 67, 87, 132-33). At 12:45 p.m., the orange Yukon departed the residence, and a minute later the gray BMW returned, the garage door opened, the BMW entered the garage and the garage door closed, indicating that the drug transaction had been completed. (Tr. at 65-66, 68).

---

[8]The troopers were asked to conduct a traffic stop if there was probable cause that a traffic violation occurred, a "wall off" stop. (Tr. at 38, 47). However, if necessary, Agent Krawczyk would have asked that the stop be conducted based on the events observed at the residence. (Tr. at 45).

AO 72A
(Rev.8/82)

Corporal Charles Chapeau[9] and Trooper Rick Barber[10] were the GSP officers

assisting DEA on December 3, 2010. (Tr. at 146, 312). Initially the troopers were in

the area to be the uniform presence at a residence where they understood the DEA was

obtaining a search warrant. (Tr. at 146, 312). However, when a F-150 left the

residence, DEA asked the troopers to follow and develop probable cause to conduct

---

[9]Corporal Chapeau had been with GSP for thirteen years and had been on the Criminal Interdiction Unit ("CID"), that works with DEA and other federal agencies, for three years. He was a supervisor on the unit. (Tr. at 143, 309-10). He had received over a hundred hours in training and was an instructor. (Tr. at 310, 380). He had been a K-9 handler for three years, receiving certification at the Alabama K-9 facility and then subsequently receiving training with a master K-9 instructor. (Tr. at 375). He has also been involved in weekly training with GSP K-9 handlers, filling in for the instructor, so that he has placed the "hides" used in training. (Tr. at 375-76). He has testified in federal court on two or three occasions about the performance of his K-9 and other K-9s. (Tr. at 378-79, 382). He has deployed his K-9 or observed another K-9 being deployed in fifty or more investigations. (Tr. at 381).

[10]Trooper Barber had been with GSP for nine years and was part of the CID. (Tr. at 143). He is a K-9 handler; his dog Jinx is a black Labrador. They worked together for three years. (Tr. at 144-45, 254, 235). He and Jinx received their training and certification, which has been renewed without any problems yearly, at the federally funded Chatham County Sheriff's Office facility used by a number of federal, state and local agencies. (Tr. at 144-45, 255). Jinx alerts to the odors of marijuana, methamphetamine, crack, cocaine and heroin by sitting. (Tr. at 146, 256). According to Trooper Barber, Jinx has alerted when no drugs have been found; however, the alert may have been to the residue of drugs, such as, a drug having been smoked in the space earlier or drugs having been in the location previously but now removed. The failure to find drugs does not indicate there was no odor. And Jinx does not alert every time deployed. (Tr. at 256-57, 301).

AO 72A
(Rev.8/82)

a traffic stop. Corporal Chapeau testified that it was "their understanding it should have drugs in the vehicle" or that drugs were what the agents were looking for.[11] (Tr. at 149, 152, 291, 312-13). DEA agents followed the vehicle, until the troopers caught up and continued following the F-150 on I-85 southbound. (Tr. at 149, 152-53). Both troopers observed the windshield and driver and passenger side windows were tinted too dark and that neither of them could see the driver. (Tr. at 152-53, 312). At approximately 12:54 p.m., Trooper Barber initiated the traffic stop by activating his blue lights, and Corporal Chapeau was his back-up. (Tr. at 149, 154, 314; Gov't Exs. 2, 3).[12]

Trooper Barber exited the patrol vehicle and approached the F-150, which was stopped on the shoulder of I-85 southbound, on the passenger side, speaking to the

---

[11]Although the troopers were on the DEA's radio frequency, they only heard intermittent transmissions due to their location. (Tr. at 147, 149-50). They did not have details about the surveillance at the residence. (Tr. at 150-51, 250-51, 313-14). The court has disregarded the various other witnesses' speculation about what the troopers heard or knew prior to the stop, to rely on what the troopers stated they knew at the time of the stop.

[12]In addition to watching the parts of the video of the traffic stop played during the evidentiary hearing, the court has watched the entire video (Gov't Ex. 2) as part of reviewing the record in this case.

AO 72A
(Rev.8/82)

occupants, Defendant Crowell, the driver, and Defendant Willis, the passenger.[13]  He

advised them that he had stopped the F-150 for a window tint violation and because

he could not be sure that they had been wearing seat belts.  (Tr. at 157, 161-63).  Using

a device to check the window tint, the trooper confirmed within a couple minutes of

pulling the truck over that the tint was darker than the legal limit.  (Tr. at 154-56, 160-

61).  He asked Defendant Crowell to provide his driver's license and about ownership

of the truck.  Defendant advised that his brother owned the F-150[14] and that his brother

had the truck for a couple of years.[15]  (Tr. at 161-62).  The trooper asked Defendant

Crowell to exit the vehicle so that he could issue a warning and let him go on his

way.[16]  (Tr. at 162-63).  While standing in front of the patrol vehicle, Trooper Barber

patted Defendant down for weapons for safety and then entered his patrol vehicle to

start the computer checks on Defendant's drivers license and criminal history and to

write the warning.  (Tr. at 164-65, 209).

---

[13]He was in uniform with his firearm and taser on his holster.  (Tr. at 292).

[14]The F-150 was registered to Otis Crowell.  (Tr. at 40).

[15]The trooper is not sure when he obtained the insurance card for the F-150 but he also had that information.  (Tr. at 209).

[16]Trooper Barber stated that most of time he will request that a driver exit the vehicle to allow him to speak with the person face to face, to observe demeanor and to remove the driver from where a weapon could be concealed.  (Tr. at 262-64).

13

Corporal Chapeau spoke with Defendants during this time and obtained Defendant Willis' driver license. (Tr. at 208, 317-20). He asked Defendant Willis about where she was coming from and going to. She responded that they had traveled up from Columbus to visit her mother who had just been released from jail to try to get her settled in an apartment. (Tr. at 317-18, 333-34). The Corporal also spoke with Defendant Crowell asking him the same question about travel. He stated that they had traveled up from Columbus to visit a friend and had just left a house.[17] (Tr. at 319, 333-34). The inconsistent travel information raised Corporal Chapeau's suspicions that more was going on than a traffic violation. (Tr. at 319-20). He also noted that Defendant Crowell was moving around, was fidgety and appeared more nervous than someone involved in a typical traffic stop.[18] (Tr. at 321-22).

At approximately six minutes into the traffic stop, Trooper Barber exited the patrol vehicle and spoke with Defendant Crowell about his travel. (Tr. at 209-10). Defendant stated that they had traveled up from Columbus that morning and visited a

---

[17]Although he does not recall exactly when, Corporal Chapeau stated that he asked Defendant Crowell if they had been to a house or an apartment and that Defendant responded, a house. (Tr. at 323).

[18]Corporal Chapeau had retrieved Defendant Crowell's jacket from the F-150 for Defendant to put on due to the cold temperature. (Tr. at 322).

14

friend of his girlfriend at a house but that he did not know the name of that person or the location of the house.[19] (Tr. at 210). Corporal Chapeau handled him Defendant Willis' driver license. (Tr. at 210). On the video, it appears that Trooper Barber next re-entered the patrol vehicle. (Gov't Ex. 2). At approximately nine minutes into the stop, the trooper exited the patrol vehicle and walked up to the cab of the F-150 where he verified that the VIN number on the insurance card matched the VIN number on the truck,[20] and he asked Defendant Willis to verify her identity and the address on her drivers license and checked to be sure that she was okay. (Tr. at 209, 211-12, 294). He also asked her about her travel. She advised that they went to visit her mother who

---

[19]While speaking with Defendant Crowell during the traffic stop, Trooper Barber noticed that Defendant's hands were shaking, that he was rubbing his hands together, and that he was moving around and licking his lips. (Tr. at 212-23, 259-60, 265). He also agreed that Defendant Crowell was cooperative, answered questions and was mostly casual. (Tr. at 260-61). As Corporal Chapeau stated, Trooper Barber testified that Defendant's nervousness did not dissipate as is normal as the traffic stop continued despite the fact he had been told that he would only receive a warning. (Tr. at 214). The court observed Defendant engaging in this conduct during the time that Defendant was in front of the patrol vehicle; however, for periods of time the court could not see Defendant as he stood to the right of the vehicle. (Gov't Ex. 2). Of course, whether Defendant's conduct was unusual for a normal traffic stop is opinion evidence offered by the troopers.

[20]The trooper verified the VIN number because he has experienced prior traffic stops when the numbers do not match because the vehicle is stolen or the insurance card is fake. (Tr. at 212).

AO 72A
(Rev.8/82)

had just been released from prison and was moving into an apartment. They visited her at the apartment complex. (Tr. at 212, 215, 294-95). He noticed that Defendant Willis looked straight ahead and did not make eye contact as he spoke with her. (Tr. at 213). He then asked Defendant Crowell, if he visited a house or an apartment, and Defendant responded a house, indicating to the trooper that Defendant was not confused about his travel story. (Tr. at 268).

Trooper Barber returned to the patrol vehicle to complete running the record checks, including on Defendant Willis, and then to print out a warning and consent to search form for the F-150. (Tr. at 220-23, 269-70). At approximately fourteen minutes and thirty-six seconds into the stop, the trooper exited his patrol vehicle and walked up to the cab of the truck to return to Defendant Willis her drivers license and then to speak with Defendant Crowell. (Tr. at 222-23). He handed back Defendant's drivers license and the insurance card and explained the warning for the window tint violation. (Tr. at 223). The traffic stop was completed; Defendants were free to leave; and the trooper began a consensual conversation with Defendant Crowell.[21] (Tr. at 224, 270, 277).

_____

[21]Prior to this time, neither Defendant had asked for their drivers licenses to be returned or asked to leave. (Tr. at 305).

AO 72A
(Rev.8/82)

Trooper Barber continued to speak with Defendant because he believed that further investigation was appropriate based on all of the circumstances, including, that the truck had left a residence where DEA was going to execute a search warrant looking for either drugs or a large amount of currency, because Defendants had provided inconsistent stories about their travel, because of the quick turn around time for the trip, approximately two hours each way, from Columbus that morning and returning early afternoon, and because of Defendant Crowell's nervous behavior. (Tr. at 213-19). The trooper asked Defendant if there was anything illegal in the truck, and according to the trooper, received quick "no's" in response until he asked if there was cocaine in the truck. At that point, Trooper Barber said that the Defendant looked down and to the right, digging into his pocket to pull out an item, which the trooper thought was currency, as Defendant said something to the effect, "No, all I have is this. . . ."[22] (Tr. at 224-25, 273-75). The trooper thought Defendant was being deceptive. (Tr. at 225). Using the consent to search form (Gov't Ex. 18), the trooper asked Defendant if he could search the F-150. Defendant consented and signed the form. (Tr. at 226-27, 324, 276). Neither of the troopers had raised their voices (more so than

---

[22]The court notes that the sound on the video is not very good due to the conditions and that it is hard to hear the exact questions or responses at this point.

AO 72A
(Rev.8/82)

necessary due to being on the side of the expressway), drawn their weapons, made any threats, or spoke harshly to the Defendants. (Tr. at 228-30, 323-24).

Trooper Barber began searching the vehicle after asking Defendant Willis to exit and stand back by the patrol vehicle.[23]  Corporal Chapeau remained with the Defendants. (Tr. at 231, 325, 228-29; Gov't Ex. 2).  After a while, Defendant Willis stated that she needed to use the bathroom, and Defendant Crowell then stated that he was ready to go. (Tr. at 325).  At approximately twenty-six minutes after the traffic stop was initiated, Corporal Chapeau immediately told Trooper Barber to stop the consent search and to retrieve his K-9 to deploy around the F-150.  The trooper complied. (Tr. at 231-32, 281, 325-26).  The corporal decided to use the K-9 based on the same factors underlying the decision to ask for consent to search. (Tr. at 323, 329-30).  At this point, neither Defendant was free to leave. (Tr. at 282, 335).

---

[23]The trooper looked inside the passenger compartment, then in the bed of the truck, and again back inside the passenger compartment. (Tr. at 280-81; Gov't Ex. 2). Part of this time, Corporal Chapeau appeared to be searching in the passenger compartment also. (Id.).  Both troopers testified that during this time, Corporal Chapeau was on his cellular telephone speaking to another trooper about an unrelated traffic stop and that, for this reason, both had switched off the audio for the recording. (Tr. at 279-80, 315). Corporal Chapeau stated that he might have forgotten to turn the sound back on. (Tr. at 315-16). A third trooper had arrived by this time. (Tr. at 292-93; Gov't Ex. 2).

18

Within a few minutes, Trooper Barber had retrieved Jinx and moved the K-9 up to the front passenger side of the F-150 to present the vehicle to the K-9. (Tr. at 233). The trooper testified that he was trained to continue moving his hand in a V pattern up and down as the K-9 sniffs to catch odors from inside the truck.[24] (Tr. at 233). As the K-9 went around the front of the truck, Trooper Barber stated that the K-9 alerted, that is, he sat, at the front passenger side door - the area between the door and front fender.[25] (Tr. at 235, 285). After completing the circle around the truck, Trooper Barber returned Jinx to his patrol vehicle and then returned to searching the F-150. (Tr. at 236; Gov't Ex. 2). Trooper Barber resumed the search of the F-150 as was his habit by checking voids or locations where compartments could hold drugs. He

---

[24]When Trooper Barber was asked about "cueing," he said that "some people" believe that a K-9 can be cued to give a false alert but that he was not "quite sure how" and that he did not do so in this case. (Tr. at 234-35, 285). He stated that he did not know how to "cue" but that he was trained to continue movement, not to pause, which could cause the K-9 to sit. (Tr. at 304).

[25]In watching the video, Jinx is not visible while in front of the F-150 or as Trooper Barber is seen coming around the front driver's side of the truck. In the vicinity of the driver's door to the front wheel well, Trooper Barber clearly stops moving and noticeably hesitates with his back to the camera, before continuing to move around the truck with Jinx. (Tr. at 284; Gov't Ex. 2). Although this is the place that he stated Jinx alerted, Trooper Barber testified that the alert is not to a specific part of the vehicle but to the whole vehicle. (Tr. at 258). Also, due to being on the side of a busy interstate, the trooper did not reward Jinx with his toy but instead praised him which is one of ways that Jinx is rewarded. (Tr. at 284, 303).

checked the gas tank cap, which he opened, looked in the bed of the truck, underneath the truck, and then re-entered the passenger compartment of the truck from the passenger side. (Tr. at 286-87, 304-05; Gov't Ex. 2). He looked again under the truck and in the wheel well areas at the back of the truck. He next re-entered the passenger compartment before exiting the truck to retrieve a tool bag from the patrol vehicle. This occurred at about forty-minutes into the traffic stop. (Tr. at 287-89; Gov't Ex. 2). Trooper Barber testified that when he examined the console in the passenger compartment, he observed that the screws had been tampered with as if "tooled," that is, the black paint on the screws was worn off as if removed a number of times. This was unusual, so he retrieved a screw driver to open the console. (Tr. at 243-45; Gov't Exs. 19, 20). When he opened the console, which he did not damage, the trooper observed four kilograms of cocaine located inside an area that had been modified to hold the drugs. This occurred at approximately forty-five minutes into the traffic stop. (Tr. at 245-46, 248; Gov't Ex. 10). The Defendants were then placed under arrest, and the DEA agents were notified immediately of the cocaine being discovered. (Tr. at 246, 247-48).

While the troopers were engaged with Defendants Crowell and Willis, TFO Purvines testified that back at 1242 Bailing Drive, over the radio, he was advised that

the orange Yukon which left the residence just after the F-150 was observed on I-85 passing the scene of the F-150 traffic stop.[26] (Tr. at 70). At 1:10 p.m., the garage door opened, and the gray BMW left the residence "at a high rate of speed" traveling to McKendree Church Road where the vehicle stopped at a stop sign. (Tr. at 69, 70-71, 98; Gov't Exs. 6, 7). Because no one else was present, TFO Purvines followed the BMW and pulled behind the vehicle at the stop sign, where he first observed the back seat passenger, Defendant Camacho, turn around and look at him and then he observed the driver, Defendant Gomez, and front seat passenger, Defendant Sanchez,[27] also turn to look at him. These actions indicated to the agent that the BMW's occupants knew he was following. (Tr. at 72-73, 98, 100).

The BMW made a right hand turn onto McKendree Church Road, driving slowly, until reaching Riverside Parkway, where the BMW stopped and the occupants again turned to look back at him. The vehicle made a right hand turn onto Riverside Parkway and again sped up. (Tr. at 74-75, 101; Gov't Ex. 7). At the River Exchange

---

[26]From observing the video of the traffic stop, Agent Krawczyk testified that the Yukon passed by at approximately 12:57 p.m. (Tr. at 410-12).

[27]This was the same Hispanic male who had first moved the BMW from the garage and parked it on the street before the F-150 arrived at the residence. (Tr. at 72-73).

Shopping Center, the BMW entered and made a series of turns to circle the shopping center before getting back on Riverside Parkway to continue in the same direction away from the Bailing Drive residence.[28] (Tr. at 75, 102). At Old Norcross Road, the BMW turned left and continued over Sugarloaf Parkway until the vehicle reached Cruse Road and made a left hand turn onto that road. (Tr. at 75-76, 103; Gov't Ex. 7). At some point between Sugarloaf Parkway and Cruse Road, as agents (TFO Purvines had been joined by other agents and TFOs) continued to follow the vehicle, they received word over the radio that four kilograms of cocaine had been found in the center console of the F-150. (Tr. at 75-76, 80, 105). The decision was made that the BMW should be stopped and the occupants detained.[29] (Tr. at 105). TFO Purvines testified that the totality of the circumstances led him to believe that Defendants were involved in a drug transaction. (Tr. at 115).

---

[28]This conduct in conjunction with the occupants turning around to look at the TFO and the BMW speeding up and slowing down indicated to TFO Purvines that Defendants were attempting to elude law enforcement. (Tr. at 78-79).

[29]After TFO Purvines returned to Bailing Drive, he attempted to estimate the time when the BMW was stopped at Regency and recorded 1:25 p.m. in his notes as his best guess. (Tr. at 81). Based on the timing on the video of the F-150 traffic stop, the cocaine would have been found at approximately 1:39 p.m. (Tr. at 90; Gov't Ex. 2). TFO Purvines repeatedly stated that the agents knew the drugs had been found before the decision was made to stop the BMW. (Tr. at 90, 105).

AO 72A
(Rev.8/82)

While other agents and TFOs continued to follow the BMW on Cruse Road, TFO Purvines observed a marked Gwinnett County patrol vehicle, and he pulled over to request assistance in stopping the BMW. (Tr. at 76). The BMW was stopped, with blue lights, by two unmarked vehicles operated by agents and TFOs, as it turned onto Regency.[30] (Tr. at 77-78, 82, 104, 125; Gov't Ex. 7). The agents and TFOs first removed the driver, Defendant Gomez, from the vehicle and patted him down for weapons for safety and then handcuffed him before seating him on the curb. (Tr. at 83, 84, 110, 173). Found on Defendant Gomez's person was a quantity, approximately $9,000, of currency and identification. (Tr. at 169, 171, 183-85, 194). The agents and TFOs observed in the BMW's center console two cellular telephones but did not seize the items at that time. (Tr. at 168-69, 174, 186, 195). Next Defendant Sanchez was removed from the vehicle, also patted down for weapons for safety, handcuffed and seated on the curb, and then Defendant Camacho was removed from the backseat, patted down for weapons for safety, handcuffed and seated on the curb. (Tr. at 83-84, 110, 121, 173). From Defendant Sanchez's person, the agents seized approximately $2,000 in currency, two cellular telephones and identification. (Tr. at 168-69, 171-72, 175, 194). The only item found on Defendant Camacho's person was his

---

[30]The BMW was registered to Esther Guerrero Lagos. (Tr. at 40).

identification. (Tr. at 169, 192, 194). On the rear passenger seat, near where Defendant Camacho had been sitting, the agents and TFOs observed another cellular telephone that was not seized at that point. (Tr. at 168-69, 175, 191-92, 194).

At the direction of the DEA supervisor, Special Agent Robert Snyder, all three Defendants and the BMW were returned to the residence at Bailing Drive. (Tr. at 187, 404). Due to the fact that he needed the agents and TFOs back at the residence, Special Agent Snyder instructed an agent to drive the vehicle back and to bring Defendants. (Tr. at 404-05). The BMW was subject to forfeiture for facilitating a drug transaction, that is, being used for counter-surveillance. (Tr. at 200-01, 404). Because the vehicle was being seized, Agent Snyder directed that the vehicle's contents be inventoried, pursuant to DEA's policy, before the tow truck arrived and agents lost control over the vehicle. (Tr. at 403-06; Gov't Ex. 23). A vehicle inventory is conducted to protect DEA from liability for damaged or lost contents. (Tr. at 201-02). The only items that were apparently found in the BMW were the three cellular telephones previously observed when Defendants were removed from the vehicle. (Tr. at 195, 406).

At the evidentiary hearing, Defendant Crowell presented the testimony of Michael Manning as an expert (not challenged by the Government) to state his opinion

24

regarding the reliability of the K-9 alert based on his review of Jinx's training records and what he observed in the video of the traffic stop. (Tr. at 343). Mr. Manning was previously employed as a police officer with the LaFayette Police Department for eight years and from 2006, until he resigned in lieu of being fired on February 17, 2011, was a certified K-9 handler.[31] (Tr. at 339-40, 343). He is currently unemployed and attends school. (Tr. at 343, 368). He received his K-9 training and annual certification at the Chatham County Sheriff Office facility and had received decoy training, which included "recogniz[ing] what things the handlers and dogs needed to work on." (Tr. at 340-41). Although he never testified in court as an expert, he has spent hundreds of hours reviewing the handling of K-9s and making the same type of assessments he was asked to make in this case. (Tr. at 342). He received $1,000 for reviewing materials in preparation for court and $1,500 for testifying for Defendant. (Tr. at 367).

Mr. Manning first discussed three records from 2008 for Jinx's training, with only one having Trooper Barber as the handler, and one undated training record with Trooper Barber as the handler. Of all the training records reviewed, he considered

---

[31]Mr. Manning was facing an internal department investigation concerning a charge of sexual misconduct but did not face criminal charges. (Tr. at 343-44, 368). As a result of that investigation, Lafayette Police Chief Freeman found that Mr. Manning "lied during the course of the internal investigation." (Tr. at 368).

25

these four the most significant. (Tr. at 346-55, 370; Def. Exs. 3, 4, 5, 6). Based on these records, Mr. Manning concluded that Jinx has difficulty detecting the odor of drugs, including large amounts, at a depth of more than one foot or at height. (Tr. at 349-51, 354-55). And, while he acknowledged that as K-9s train their skills can improve, he did not believe Jinx received the necessary training to locate "hides" placed at depth. (Tr. at 371-72).

Mr. Manning then testified about his observation of the traffic stop video when Trooper Barber deployed Jinx. (Tr. at 356). He stated that he never observed a significant change in Jinx's behavior to indicate that he alerted, which is "very" noticeable. (Tr. at 357-58, 370). He stated that Jinx should remain sitting, his alert position, until he received his reward, such as a toy or praise, which he also did not see on the video. (Tr. at 358-59). Mr. Manning testified that Trooper Barber "present[ed] targets on the driver's side in a manner which would be consistent with training." (Tr. at 359). However, at the back passenger side of the F-150, Mr. Manning believes that Trooper Barber "cued" Jinx to alert to the F-150 but acknowledged that Jinx did not alert at that point. (Tr. at 360, 369). When asked about whether Trooper Barber "cued" jinx at any other time, although Mr. Manning acknowledged that he could not see Trooper Barber and Jinx at the front of the F-150 and could only partially see the

26

trooper on the front driver side of the F-150, he responded that it "appeared that [Trooper Barber] spent a significant amount of time at the front." (Tr. at 363-64). And he also opined that there was no alert during the time he could not see Jinx. (Tr. at 364).

In response, the Government recalled Corporal Chapeau who was qualified as an expert on the same topic. (Tr. at 374, 375-85). In addition to the information provided by Corporal Chapeau previously, he testified that as part of the training for K-9s at GSP, he has placed "hides" for Jinx, including at depth in boxes, luggage and vehicles, which GSP K-9s "see[ ] all the time," and has placed "hides" at height, all of which Jinx has successfully located, and he therefore has been involved in training Jinx. (Tr. at 375-77, 385). And, on December 3, 2010, he witnessed Trooper Barber deploy Jinx on the F-150. His vantage was from the passenger side of the patrol vehicle - just to the right of the view observed on the video. (Tr. at 285, 392-93). He could not see Jinx at the front or front driver side of the truck, but he observed Trooper Barber pause at the area of the driver side door and thought that Jinx had alerted at that point, which Trooper Barber confirmed. (Tr. at 393, 395). He was also asked if, now knowing that drugs were placed into the F-150's center console, he had an opinion why Jinx alerted in the area of the driver side door. He stated that whoever placed the

27

drugs into the F-150 would have handled the door leaving the odor of the drugs. (Tr. at 386). He also stated that as Jinx came around the front bumper of the truck, Jinx would have caught the drug odor, which permeates from the truck from a crack or crevice, and being on the roadway with the drafts from passing vehicles, the odor would have been pulled to the front of the F-150. (Tr. at 386-87). In his opinion, acknowledging that it was windy and that the cocaine was wrapped in plastic and concealed in the console in a closed truck, the depth or height at which the cocaine was hidden under the conditions on December 3, 2010, would not have impacted Jinx's ability to detect the odor. (Tr. at 387, 392).

Additional facts will be set forth as necessary during discussion of Defendants' motions to suppress.

## II. Discussion

### a. F-150 Traffic Stop and Search

Although Defendant Crowell does not challenge the probable cause for the initial traffic stop, he does challenge the duration of the traffic stop contending that Trooper Barber had determined within two minutes that a window tint violation had occurred and that asking unrelated questions about travel unreasonably extended the duration of the stop to fifteen minutes. [Doc. 131 at 11-13]. And, although he agrees

28

that the period of approximately nine minutes from the end of the traffic stop (during the consensual interview and consent search, which he does not contend was involuntary) did not involve an unlawful detention, he contends that the troopers lacked reasonable suspicion to continue the detention once Defendant revoked his consent and asked to leave. [Id. at 13-29]. He also challenges the reliability of the K-9 alert on the F-150 and, therefore, contends that there was no probable cause to search the truck. And, finally, if there was probable cause based on the alert, he alleges that the dismantling of the center console exceeded the scope of the probable cause. [Id. at 31-43]. Based on consideration of the totality of the circumstances and the record before the court, the court finds that Defendant's arguments are not persuasive.

"A traffic stop, which 'is a seizure within the meaning of the Fourth Amendment,' . . . 'is constitutional if it is either based upon probable cause to believe a traffic violation has occurred or justified by reasonable suspicion in accordance with Terry[v. Ohio, 88 S. Ct. 1868 (1968)].'" United States v. Spoerke, 568 F.3d 1236, 1248 (11th Cir. 2009) (citations omitted). As the Eleventh Circuit Court of Appeals stated in United States v. Cooper, 133 F.3d 1394 (11th Cir. 1998), "law enforcement 'may stop a vehicle when there is probable cause to believe that the driver is violating any one of the multitude of applicable traffic and equipment regulations relating to the

operation of motor vehicles.'" 133 F.3d at 1398 (quoting United States v. Strickland, 902 F.2d 937, 940 (11th Cir. 1990)); see also United States v. Terry, 220 Fed. Appx. 961, 963 (11th Cir. 2007) (same). And "[w]hen determining whether an officer had probable cause to believe that a traffic violation occurred, the 'officer's motive in making the traffic stop does not invalidate what is otherwise objectively justifiable behavior under the Fourth Amendment.'" United States v. Harris, 526 F.3d 1334, 1337 (11th Cir. 2008) (citation omitted).

As noted, law enforcement officers may also briefly detain individuals for purposes of investigating a crime if they have a reasonable, articulable suspicion based on objective facts that the individual has engaged in, or is about to engage in, criminal activity. See Terry, 88 S. Ct. 1868; Harris, 526 F.3d at 1337 (same). "[T]he 'reasonableness' standard requires that a police officer 'be able to point to specific and articulable facts, which, when taken together with rational inferences from those facts, reasonably warrant that intrusion.'" United States v. Mikell, 102 F.3d 470, 474-75 (11th Cir. 1996) (citing Terry, 88 S. Ct. at 1880). Additionally, "[d]uring a lawful traffic stop, officers . . . may take steps that are reasonably necessary to protect their personal safety . . ., including requiring the driver and passengers to exit the vehicle

30

'as a matter of course.'" Spoerke, 568 F.3d at 1248 (quoting Maryland v. Wilson, 117 S. Ct. 882, 884 (1997); Pennsylvania v. Mimms, 98 S. Ct. 330, 333-34 (1977)).

The legality of traffic stops is analyzed under the test set forth in Terry. "[A] traffic stop 'must last no longer than is necessary to effectuate the purpose of the stop.'" United States v. Ramirez, 476 F.3d 1231, 1237 (11th Cir. 2007) (quoting United States v. Pruitt, 174 F.2d 1215, 1220 (11th Cir. 1999)). Absent articulable suspicion of other criminal activity, a traffic stop may last no longer than necessary to process the traffic violation. United States v. Purcell, 236 F.3d 1274, 1277 (11th Cir. 2001). In United States v. Hernandez, 418 F.3d 1206 (11th Cir. 2005), the Eleventh Circuit Court of Appeals, relying on the Supreme Court's decision in Muehler v. Mena, 125 S. Ct. 1465 (2005), stated that the focus in evaluating the reasonableness of a detention during a traffic stop is "on duration (and not scope of questioning). . . ." 418 F.3d at 1209 n.3. Accordingly, a court does "not inquire as to the substantive reasonableness of the questions that are asked by a police officer in the context of a traffic stop, but only whether the 'duration' of the detention was prolonged 'for an unreasonable time.'" Ramirez, 476 F.3d at 1237 n.11 (quoting Hernandez, 418 F.3d at 1209 n.3); see also United States v. Ffriend, 151 Fed. Appx. 778, 779 (11th Cir. 2005) ("Moreover, during a legal stop, an officer may ask questions, including

questions not strictly related to the traffic stop, while waiting for a computer check of registration or examining a driver's license."). Finally, the duration of a traffic stop may be prolonged to investigate, by the use of computer checks, the driver's license and the vehicle registration and, for officer's safety, the criminal history of the driver. United States v. Boyce, 351 F.3d 1102, 1106 (11th Cir. 2003)[32]; Purcell, 236 F.3d at 1277-78.

Applying this case law to the facts deemed credible by the court, the initial traffic stop was not unreasonably prolonged, and the subsequent detention was based on reasonable suspicion that Defendant was engaged in criminal conduct and that contraband was secreted in the F-150. There is no dispute that Trooper Barber legitimately conducted a traffic stop based on probable cause to believe that the window tint on the F-150 was too dark and violated that traffic law. (Tr. at 153-54, 253, 312). And, although Trooper Barber confirmed that violation of law within a few minutes of initiating the stop, in making his arguments about the duration of the stop,

---

[32]However, each of these computer checks must be conducted as a routine part of the traffic stop and not undertaken after the conclusion of the traffic stop to further detain a driver absent articulable suspicion of other criminal activity. Boyce, 351 F.3d at 1107 (finding that the criminal history check in that case was not requested until several minutes after the traffic stop had concluded and after the officer had asked for and been refused consent to search the vehicle).

32

Defendant ignores that the fact that the trooper was legitimately conducting drivers license and criminal history backgrounds by computer on both of the F-150 occupants, as well as verifying the VIN number with the insurance information, which he is permitted to do during a routine traffic stop.[33]  (Tr. at 157, 160-65, 208-12, 220-23, 269-70, 320).  There is no information in the record that such checks are not standard operating procedure during a GSP traffic stop.  All of the inquiries about Defendants' travel that day by both troopers occurred during the time period that the computer checks were running and while Trooper Barber was verifying information about the truck and Defendant Willis' address.  (Tr. at 164-65, 208-12, 215, 219-23, 294-95, 317-20, 322-24).

And the traffic stop was completed within fifteen minutes of the initiation of the stop.  (Tr. at 222-23, 269-70).  In <u>Hernandez</u>, although the Eleventh Circuit Court of Appeals decided the case based on finding that from its inception the valid traffic stop involved additional suspicious factors triggering the officer's right to investigate further, the court noted:

---

[33]Trooper Barber also provided a reasonable explanation for asking Defendant to exit the F-150, that is, to remove him from the vicinity of any concealed weapon, to allow them to talk face-to-face, and to observe Defendant's demeanor. (Tr. at 262-64).

AO 72A
(Rev.8/82)

But something else seems worth pointing out. Where at its inception a traffic stop is a valid one for a violation of the law, we doubt that a resultant seizure of no more than seventeen minutes can ever be unconstitutional on account of its duration: the detention is too short. By the way, no appellate decision has been called to our attention [or for that matter to this court's attention] that has held such a short detention - linked to a legitimate traffic stop - to be an unreasonable seizure under the Fourth Amendment on account of the stop's duration.

418 F.3d at 1212 n.7[34]; accord United States v. Hawkins, 2011 WL 2313672, at *4 (M.D. Ala. May 27, 2011) (finding that traffic stop of twenty-eight minutes not unreasonable given prior circuit court decisions allowing traffic stop of fifty minutes, citing United States v. Hardy, 855 F.2d 753, 761 (11th Cir. 1988), twenty minutes, citing United States v. Geboyan, 367 Fed. Appx. 99, 100 (11th Cir. 2010), and fourteen minutes, citing Purcell, 236 F.3d at 1278). The traffic stop was not unreasonably prolonged.

As Defendant Crowell acknowledges, when Trooper Barber returned to Defendants their drivers licences and insurance information and provided Defendant Crowell the warning for the window tint infraction, the traffic stop was over, and

---

[34]The court further noted that a traffic stop can last long enough for police "to conduct a variety of checks about licenses, registration, insurance and so on" and that "the police are not constitutionally required to move at top speed or as fast as possible." Id. "And at a traffic stop, the police can occasionally pause for a moment to take a breath, to think about what they have seen and heard, and to ask a question or so." Id.

AO 72A
(Rev.8/82)

Defendants were free to leave. (Tr. at 222-27, 269-70, 277). The encounter was at that point consensual and any further conversation, including asking Defendant Crowell for consent to search the F-150, was part of that consensual encounter. Ramirez, 476 F.3d at 1237 ("'further questioning unrelated to the initial stop is permissible if the initial detention has become a consensual encounter'") (quoting Pruitt, 174 F.3d at 1220). During the consensual encounter, Trooper Barber first asked Defendant whether there was any type of contraband in the F-150 and then asked Defendant for permission to search the truck presenting Defendant with a written consent to search form, which Defendant signed. (Tr. at 224-30, 273-77). As noted, Defendant does not contest the voluntariness of the consent to search and nothing in the record indicates that the consent was not voluntary. (Tr. at 266-30).

Trooper Barber started the search; and, after approximately ten minutes, Defendant Willis began noting that she had to use the bathroom; then Defendant Crowell stated that he was ready to go. Trooper Chapeau, who was standing with the Defendants, advised Trooper Barber to stop searching and to deploy his K-9 around the F-150. Defendants were not then free to leave. (Tr. at 231-32, 280-83, 326-27, 335). Based on the totality of the information known collectively to all of the law enforcement personnel participating in the investigation and subsequent traffic stop,

35

there were "'specific and articulable facts, which, when taken together with rational inferences from those facts, [that] reasonably warrant[ed]'"[35] detention of Defendants to allow the troopers to investigate further.[36] Mikell, 102 F.3d at 474-75 (citation omitted).

---

[35]And those inferences are considered in light of the training and experience of the agents and troopers conducting the investigation. See United States v. Lindsey, 482 F.3d 1285, 1290-91 (11th Cir. 2007) ("We also recognize that the police may 'draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person.'") (citation omitted); United States v. Smith, 201 F.3d 1317, 1323 (11th Cir. 2000) ("In deciding whether the detaining officers had reasonable suspicion, we look at the totality of the circumstances known to the detaining officers at the time of the detention[,]" which includes viewing all of the circumstances "in the light of the officers' special training and experience."); United States v. Diaz-Lizaraza, 981 F.2d 1216, 1221 (11th Cir. 1993) ("While none of these actions is criminal on its face, together they did provide the trained agents with reasonable suspicion" that the defendant was involved in criminal activity.).

[36]Also, the troopers conducted the investigative stop in a manner that quickly and diligently, with minimal intrusion, confirmed suspicions that Defendants were transporting drugs. Within a few minutes, the K-9 was deployed, and the examination of the exterior of the F-150 by the dog completed. (Tr. at 231-33, 282, 326-27). During the entire stop, Defendants were not restrained or handcuffed; the tone of the conversation with Defendants was appropriate for the roadside circumstances; the troopers did not draw their weapons or otherwise threaten Defendants. Only one other trooper (and sometimes two) was present, for safety. (Tr. at 222-23, 228-30, 269, 292, 305, 323-25). These facts indicate that the detention was conducted within the scope of a Terry stop. See United States v. Acosta, 363 F.3d 1141, 1144, 1146 (11th Cir. 2004).

AO 72A
(Rev.8/82)

The facts that form a part of the collective knowledge relied upon to establish a reasonable suspicion to further detain Defendants is not limited to observations relayed in detail to the troopers by other law enforcement personnel involved in the investigation or to observations the troopers personally made during the traffic stop. In United States v. Glinton, 154 F.3d 1245 (11th Cir. 1998), the Eleventh Circuit Court of Appeals rejected a defendant's argument that because the officers effecting the stop of the vehicle in which he was riding did not have personal knowledge establishing a reasonable suspicion of criminal activity, the stop was unlawful. Noting "that reasonable suspicion is determined by the *collective* knowledge of the officers involved in the stop[,]" the court stated, "The fact that the task force officers who ordered the stop by radio had reasonable suspicion to believe [the defendant] was carrying drugs satisfies the Terry requirements for an investigative stop." Id. at 1257 (emphasis in original). See, e.g., United States v. Goddard, 312 F.3d 1360, 1363-64 (11th Cir. 2002) ("Observations and other information supplied by officers involved in a common investigation can, taken together, create probable cause for a search."); United States v. Kapperman, 764 F.2d 786, 791 n.5 (11th Cir. 1985) (although the officer effecting the stop "may not have known all of the facts already uncovered in the investigation[,]" he "was entitled to act on the strength of the radio communication directing him to

37

'stop the vehicle and secure the scene'"); <u>United States v. Olmedo</u>, 552 F. Supp. 2d 1347, 1356-57 (S.D. Fla. 2008) (relying on the Supreme Court decisions in <u>United States v. Hensley</u>, 105 S. Ct. 675 (1985), and <u>Whiteley v. Warden, Wyo. State Penitentiary</u>, 91 S. Ct. 1031 (1971), the court held that "at least with regard to an investigatory stop, there is no requirement that police who have reasonable suspicion sufficient to justify a stop communicate the basis of that reasonable suspicion to police who have been instructed to effectuate the stop"); <u>United States v. Jackson</u>, 548 F. Supp. 2d 1314, 1321 (M.D. Fla. 2008) (rejecting the defendant's contention that because the officer effecting traffic stop was not aware of the wiretapped conversations, which were known to other investigating officers, that information could not be used in evaluating probable cause for the search and applying the collective knowledge of all of the investigating officers to find probable cause).

By the time that the decision was made to detain Defendants to allow the K-9 to be deployed around the F-150, the agents, TFOs and troopers were aware of the following facts. Law enforcement personnel involved in the investigation believed that 1242 Bailing Drive was a stash house used by an individual named Beto, who had been intercepted during a court authorized wire tap. (Tr. at 11-12, 28-35). Trash pulls during the week of December 3, 2010, provided additional indications of narcotics

38

trafficking associated with the residence. (Tr. at 34). On December 3, 2010, DEA agents and TFOs conducted surveillance at the residence while other agents were securing a federal search warrant and observed what, based on their training and experience, they believed to be a drug transaction involving the F-150. (Tr. at 35, 38).

At 11:45 a.m., TFO Purvines observed a gray BMW back out of the residence's garage and park on the street in front of the residence, and the driver, Defendant Sanchez, exited the vehicle and entered the residence. (Tr. at 57-58, 92; Gov't Ex. 4). At 11:50 a.m., an orange Yukon arrived at the residence and parked on the street in front of the BMW, and a Hispanic male, never identified, exited and entered the residence. (Tr. at 59-60; Gov't Ex. 5). At 12:30 p.m., the black F-150 truck occupied by two individuals arrived at the residence, drove up the driveway as the garage door opened, and entered the garage as the garage door closed behind the vehicle. (Tr. at 60).

After approximately eight minutes, Defendant Camacho exited the residence, entered the BMW, and drove out of the subdivision to a Walgreens on Riverside Parkway, where he parked the BMW and, according to the agents observing him, conducted counter-surveillance looking for law enforcement activity. (Tr. at 61-63, 67, 94, 130; Gov't Exs. 6, 7). At 12:40 p.m., the garage door to the residence opened

39

and the F-150 backed out and left the subdivision. TFO Purvines directed other agents to follow the vehicle, and Troopers Barber and Chapeau, who were staged nearby to assist,[37] were asked to conduct a traffic stop of the F-150 because all of the observations "led agents to believe that this was a classic pick up - drop off narcotics and pick up by a second individual . . . a transaction had occurred" at a location believed to be a stash house. (Tr. at 36-38, 67, 87, 132-33). At 12:45 p.m., the orange Yukon departed the residence, and a minute later the gray BMW returned, the garage door opened, the BMW entered the garage and the garage door closed, indicating to the agents and TFOs that the drug transaction had been completed. (Tr. at 65-66, 68).

Although those facts are sufficient to provide reasonable suspicion to stop the F-150, during the traffic stop, the troopers learned additional information that contributed to a finding of reasonable suspicion, including the inconsistent travel stories related by Defendants. Defendant Crowell told both troopers that they or we, that is, he and Defendant Willis, had traveled up from Columbus that morning to visit a friend of his girlfriend at a house, but he could not remember the name of the friend

_____

[37]The troopers knew that they were assisting DEA who were trying to secure a search warrant for a residence, and Corporal Chapeau testified they were asked to stop the truck because it was "their understanding it should have drugs in the vehicle" or that drugs were what the agents were looking for. (Tr. at 146, 149, 152, 291, 312-13).

AO 72A
(Rev.8/82)

or the location of the house. (Tr. at 210, 268, 319, 333-34). He also confirmed that he had visited a house not an apartment. (Tr. at 268, 323). Defendant Willis, however, stated that they had traveled from Columbus that morning to visit her mother at the apartment she was moving into after having just been released from prison. (Tr. at 212, 268, 317-18). The stories are flatly contradictory, and the troopers reasonably concluded that at least one Defendant was lying, all of which reasonably justified raising the troopers' suspicions. See United States v. Ubaldo-Viezca, 398 Fed. Appx. 573, 575, 581 (11th Cir. 2010) (occupants of vehicle providing conflicting statements about destination, one stating that they were on their way to an auction in North Carolina while other stated auction was in South Carolina, was considered one factor in establishing a reasonable suspicion to continue traffic stop); Pruitt, 174 F.3d at 1220 (among the variety of factors that have justified further questioning during a traffic stop is "inconsistent statements about destination"); United States v. Sanchez, 408 F. Supp. 2d 1255, 1259 (S.D. Fla. 2005) (finding that the inconsistent statements about travel made by the driver and passenger were "sufficient to arouse reasonable suspicion"); accord United States v. Howard, 991 F.2d 195, 201-02 (5th Cir. 1993) (based on all the facts known to the officers, which included the defendant's lies about ownership of the vehicle in question, there was probable cause for a search of the

41

vehicle); United States v. Koshnevis, 979 F.2d 691, 695 (9th Cir. 1992) (finding that defendant's inconsistent statements about ownership of the vehicle and his lie that he did not have a key for the vehicle's trunk, along with other factors, established probable cause for a search of the vehicle's trunk). The troopers also pointed to the quick turn around time for the lengthy trip up from Columbus that morning and heading home by 1:00 p.m., indicating very little time for a visit with friends or Defendant Willis' mother, as well as the unusual and continued nervousness of both Defendants during the traffic stop, as other factors that contributed to the decision to detain Defendants for the K-9 sniff. (Tr. at 212-14, 216-17, 219, 232, 321-22). The totality of the circumstances known to all of the investigating agents, the TFOs and the troopers established the necessary reasonable suspicion to detain Defendants after the consent to search was withdrawn.

Defendant Crowell's next challenge focuses on the probable cause to search the F-150 and the scope of the search. [Doc. 131 at 31-41]. In addition to arguments challenging the credibility of the troopers regarding their testimony about the K-9 alert, which this court has addressed and found unpersuasive, Defendant also attacks the K-9's reliability based on the testimony of Michael Manning who was qualified to give an expert opinion regarding the reliability of the K-9 alert based on his review of Jinx's

42

training records and what he observed on the video of the traffic stop. (Tr. at 343). In response, the Government recalled Corporal Chapeau, who was likewise qualified to give an expert opinion on the same topic. (Tr. at 374, 375-85). The court does not find Mr. Manning's opinion that Jinx was unreliable and did not alert on December 3, 2010, persuasive and finds that the Government sufficiently established Jinx's reliability to detect the odor of drugs to support a finding of probable cause for the search.

Defendant does not dispute that an alert to the odor of drugs by a trained detector dog provides probable cause for a search. See United States v. Nelson, 309 Fed. Appx. 373, 375 (11th Cir. 2009); Glinton, 154 F.3d at 1257. Evidence that a K-9 is "well-trained" generally establishes that the K-9's alert is reliable. Nelson, 308 Fed. Appx. at 375; United States v. Anderson, 367 Fed. Appx. 30, 32 (11th Cir. 2010) ("While a dog sniff must be sufficiently reliable in order to establish probable cause, we have held in dicta 'that training of a dog alone is sufficient proof of reliability.'") (quoting United States v. Sentovich, 677 F.2d 834, 838 n.8 (11th Cir. 1982)). The court finds that the evidence establishes that both Trooper Barber and Jinx were "well-trained." Trooper Barber and Jinx, a black Labrador, had worked together for three years. (Tr. at 144-45, 254, 235). He and Jinx received their training and certification, which has been renewed without any problems yearly, at the federally funded Chatham County

43

Sheriff's Office facility used by a number of federal, state and local agencies. (Tr. at 144-45, 255). Additionally, as part of the training for K-9s at GSP, Corporal Chapeau, who is also a certified K-9 handler, has placed "hides" for Jinx, including at depth in boxes, luggage and vehicles, which GSP K-9s "see[ ] all the time," and has placed "hides" at height, all of which Jinx has successfully located. (Tr. at 375-77, 385). Jinx alerts to the odors of marijuana, methamphetamine, crack, cocaine and heroin by sitting. (Tr. at 146, 256). Although Mr. Manning[38] testified that he did not believe Jinx had received the training necessary to overcome difficulties with finding "hides" placed at height or depth based on his review of the training records (Tr. at 346-55, 370-72), the court does not find that his opinion is supported by the evidence.

Defendant's attacks on Jinx's reliability to find drugs secreted at depth or height based on Mr. Manning's testimony about four training records, three from 2008 and one undated (Tr. at 346-55, 370; Def. Exs. 3, 4, 5, 6), simply does not "suggest that [Jinx] was so unreliable that a reasonable officer in [Trooper Barber's] position would

_____

[38]There are credibility issues with Mr. Manning besides the court's evaluation of his testimony at the evidentiary hearing. His employment as a police officer with the LaFayette Police Department ended when he resigned in lieu of being fired on February 17, 2011, during an internal investigation that alleged he had engaged in sexual misconduct. (Tr. at 339-40, 343-44). More significantly, as a result of that investigation, Lafayette Police Chief Freeman found that Mr. Manning "lied during the course of the internal investigation." (Tr. at 368).

44

have developed less than probable cause to search the vehicle." United States v. Mack, 2010 WL 551065, at *6 (M.D. Ala. February 11, 2010). Courts have held that an accuracy rate of approximately 50%-60% "in finding measurable amounts of drugs" does not undermine the reliability of the K-9 to the extent of negating probable cause because as is clear from the case law, "'[a]bsolute certainty is not required by the Fourth Amendment[,]'" instead probable cause only requires "'a *fair probability* that contraband . . . will be found.'" Anderson, 367 Fed. Appx. at 33 (citations omitted; emphasis in original); Mack, 2010 WL 551065, at *3 n.1 (even assuming that the K-9 was "'unambiguously wrong thirty-one percent of the time,'" that fact does not undermine the reliability of the alert in establishing probable cause).

Based on Trooper Barber's experience with Jinx, including receiving annual certifications, regular training, and their working relationship (Tr. at 144-45, 235-36, 299-301), and Corporal Chapeau's observations of Jinx during training (Tr. at 375-77, 385), the troopers reasonably relied on Jinx's ability to detect the odor of drugs emanating from the F-150. The fact that Jinx had alerted in the past when no drugs were found does not indicate that Jinx is not reliable. As Trooper Barber explained, the alert may have been to the residue of drugs, such as, a drug having been smoked in the space earlier or drugs having been in the location previously but now removed.

45

The failure to find drugs does not indicate there was no odor. And Jinx does not alert every time deployed. (Tr. at 256-57, 301). See Mack, 2010 WL 551065, at *6 n.3 ("The mere fact that no obvious drugs were found on six occasions does not necessarily mean that there were not traces of drugs present in a sufficient amount to cause [the K-9] to alert to their presence."). The evidence presented at the hearing establishes that the troopers reasonably relied on Jinx's alert to conclude, especially in light of the other facts known to the law enforcement personnel on December 3, 2010, as outlined above, that there was a fair probability that drugs were concealed in the F-150.

The court does not find persuasive the evidence presented by Defendant that Jinx simply did not alert to the F-150. Mr. Manning's testimony about his observation of the traffic stop video when Trooper Barber deployed Jinx is not credible. (Tr. at 356). Mr. Manning reached a number of conclusions about what happened on December 3, 2010, without ever having observed Jinx being deployed in the past or providing any background as to familiarity with deploying any K-9 under the conditions that day on a busy interstate. Although he concedes that he could not see Jinx and could only partially observe the trooper at the front and front driver side of the truck and acknowledges that the trooper paused - as is evident from observing the video, he

46

opined that there was no alert during the time he could not see Jinx. (Tr. at 363-64). It is quite understandable why, under the circumstances, Mr. Manning never observed a significant change in Jinx's behavior indicating an alert, which in his words is "very" noticeable, and why he did not observe that Jinx remained sitting until he received his reward, such as a toy or praise. If, as Trooper Barber testified, the alert occurred at the front driver side of the F-150, no one but Trooper Barber was in a position to observe Jinx's actions.[39] (Tr. at 357-59, 370). Despite the fact that Mr. Manning testified that Trooper Barber "present[ed] targets on the driver's side in a manner which would be consistent with training[,]"[40] when asked about whether Trooper Barber "cued" Jinx (besides at the rear of the F-150), he responded that it "appeared that [Trooper Barber] spent a significant amount of time at the front" of the F-150. (Tr. at 359, 363-64).

---

[39]In watching the video, Jinx is not visible while in front of the F-150 and as Trooper Barber is seen coming around the front driver's side of the truck. In the vicinity of the driver's door to the front wheel well, Trooper Barber clearly stops moving and noticeably hesitates, before continuing to move around the truck with Jinx. (Tr. at 284; Gov't Ex. 2).

[40]However, at the back passenger side of the F-150, Mr. Manning believes that Trooper Barber "cued" Jinx to alert to the F-150 but acknowledged that Jinx did not alert at that point. (Tr. at 360, 369). There is simply no evidence that Jinx was "cued" or that Jinx gave a false alert in this case.

47

Apparently, he meant to infer that the trooper may have "cued" Jinx then - which would be purely speculation in this court's opinion.

Contrasted to Mr. Manning's testimony, Trooper Barber, who has extensive experience with Jinx, and Corporal Chapeau, who has trained Jinx, both witnessed on December 3, 2010, Jinx being deployed. Corporal Chapeau's vantage was from the passenger side of the patrol vehicle - just to the right of the view observed on the video. (Tr. at 285, 392-93). Trooper Barber testified that Jinx alerted, that is, he sat, at the front passenger side door - the area between the door and front fender and, due to being on the side of a busy interstate, that he did not reward Jinx with his toy but instead praised the dog. (Tr. at 235, 284-85, 303). And, although he could not see Jinx at the front or front driver side of the truck, Corporal Chapeau observed Trooper Barber pause at the area of the driver side door and thought that Jinx had alerted at that point, which Trooper Barber confirmed. (Tr. at 393, 395). Corporal Chapeau obviously found nothing inconsistent in Jinx's demeanor after that point with the K-9 having alerted to the F-150.

Corporal Chapeau also testified about why Jinx would have alerted at the front driver side of the F-150. He stated that whoever placed the drugs into the F-150 would have handled the door leaving the odor of the drugs. (Tr. at 386). He also stated that

48

as Jinx came around the front bumper of the truck, Jinx would have caught the drug odor, which permeates from the truck from a crack or crevice, and that, being on the roadway with the drafts from passing vehicles, the odor would have been pulled to the front of the F-150. (Tr. at 386-87). In his opinion, acknowledging that it was windy and that the cocaine was wrapped in plastic and concealed in the console in a closed truck, the depth or height at which the cocaine was hidden under the conditions on December 3, 2010, would not have impacted Jinx's ability to detect the odor. (Tr. at 387, 392).

Based on the evidence in the record, the court finds that Jinx's reliability was established, that Trooper Barber properly handled the K-9, and that he credibly testified that Jinx alerted to the F-150. See Nelson, 309 Fed. Appx. at 375-76 (finding that based on the testimony about the K-9's training and certification, and given the handler's experience with the K-9, and other dogs, the handler's testimony about the alert was sufficient proof of reliability and provided probable cause for the vehicle search); United States v. Owens, 167 F.3d 739, 749 (1st Cir. 1999) (upholding trial court's determination that K-9 was reliable based on the testimony of training supervisor and K-9's handler that dog was extremely reliable and that dog was certified

49

at time of search, although K-9 had failed to pass two certification tests and despite testimony of expert on animal behavior that dog was not reliable).

Contrary to Defendant's argument, the location of Jinx's alert did not restrict the search to a specific area of the F-150. The Eleventh Circuit Court of Appeals in United States v. Fernandez Martinez, 317 Fed. Appx. 929 (11th Cir. 2009), stated, "If police have probable cause to believe a container containing contraband will be found in a car, then the police may search the car for the container without a warrant." Id. at 935; see also Wyoming v. Houghton, 119 S. Ct. 1297, 1301 (1999) ("'If probable cause justifies the search of a lawfully stopped vehicle, it justifies the search of *every part of the vehicle and its contents* that may conceal the object of the search.'") (citation omitted; emphasis in original); United States v. Mathis, 239 Fed. Appx. 513, 515 (11th Cir. 2007) (same).

In United States v. Kelly, 592 F.3d 586 (4th Cir. 2010), the Fourth Circuit Court of Appeals rejected the argument made by Defendant in this case. The defendant challenged the scope of the search, which extended to the trunk of the vehicle, because, he argued, the K-9's alert at the driver's side door only allowed a search of the passenger compartment. Id. at 592. Recognizing that "probable cause to search one compartment or container within a car does not invariably provide probable cause to

50

search the entire vehicle[,]" id. (citing California v. Acevedo, 111 S. Ct. 1982, 1991 (1991)), the court stated, "it does not follow . . . that a dog's alert at one compartment cannot give probable cause to search another compartment simply because the latter is a few feet away." Id. The court stated:

> Probable cause is simply not so exacting a standard that it requires a dog to be able to pinpoint the location of drugs within a foot or two. Instead, it is a "commonsense" conception that deals with "the factual and practical considerations of everyday life." . . . Dogs, of course, react not to the presence of drugs themselves but to their odors. And, as the K-9 officer in this case explained, odors travel within a car and seep through loose seals into the outside environment. Consequently, he continued, it is not uncommon for dogs to alert at the doors of vehicles where the seals tend to be heavily worn. Given these practical realities, we think it was reasonable to conclude that the odor which the dog detected may have traveled from the trunk, which is after all a logical place for drugs to be stored.

Id. (citation and internal quotation marks omitted); see also Hill v. Sharber, 544 F. Supp. 2d 670, 680 (M.D. Tenn. 2008) (once the trained K-9 alerted to the vehicle, the resulting search of a duffle located in the vehicle, which could reasonably contain the object of the search, was within the scope of the probable cause provided by the alert). Both troopers testified that Jinx alerted to the odor of drugs permeating from the interior of the truck - seeping out the truck from some crack or crevice and pulled by

AO 72A
(Rev.8/82)

the road side conditions to the front area of the truck - and not from a specific location in the truck.[41]  (Tr. at 258, 386-87).

After securing Jinx, Trooper Barber continued the search of the F-150 from the point that he was interrupted by Defendant Crowell withdrawing his consent.  Trooper Barber resumed the search of the F-150 as was his habit by checking voids or locations where compartments could hold drugs.  He checked the gas tank cap, which he opened, looked in the bed of the truck, underneath the truck, and then re-entered the passenger compartment of the truck from the passenger side.  (Tr. at 286-87, 304-05; Gov't Ex. 2).  He looked again under the truck and in the wheel well areas at the back of the truck and next re-entered the passenger compartment before exiting the truck to retrieve a tool bag from the patrol vehicle.  This occurred at about forty-minutes into the traffic stop.  (Tr. at 287-89; Gov't Ex. 2).  Trooper Barber testified that when he examined the console in the passenger compartment, he observed that the screws had been tampered with as if "tooled," that is, the black paint on the screws was worn off as if removed a number of times.  This was unusual, so he retrieved a screw driver to open the console.  (Tr. at 243-45; Gov't Exs. 19, 20).  When he opened the console, which he

––––––––––––––––––––

[41]This also explains why, contrary to Defendant's argument, the trooper did not focus his search on the driver's side passenger compartment of the truck.

52

did not damage, the trooper observed four kilograms of cocaine located inside an area that had been modified to hold the drugs. This occurred at approximately forty-five minutes into the traffic stop. (Tr. at 245-46, 248; Gov't Ex. 10). The court finds that the search of the F-150, including the console, "which could reasonably contain the object of the search," Hill, 544 F. Supp. 2d at 680, did not exceed the scope of the probable cause for the search, nor was the search unreasonable.

For these reasons, the court finds that the initial stop did not exceed the time necessary to conduct a routine traffic stop, that the facts established a reasonable suspicion that Defendants were engaged in criminal activity to detain them briefly while the K-9 was deployed, and that the K-9's alert, especially when considered in light of all the information collectively known to the investigating law enforcement personnel, provided probable cause to search the interior of the F-150, including the center console. Accordingly, the court **RECOMMENDS** that Defendant Crowell's motions [Docs. 68, 103] to suppress be **DENIED**.[42]

---

[42]Defendant also filed a motion [Doc. 69] to suppress statements pursuant to Jackson v. Denno. Defendant did not argue in his post-hearing brief that he was subjected to custodial interrogation at any time before the cocaine was discovered and he was handcuffed. [Doc. 131]. And there is no evidence before the court that Defendant made any statements following his arrest on December 3, 2010. For these reasons, the court **RECOMMENDS** that Defendant's motion be **DENIED** as **MOOT**.

AO 72A
(Rev.8/82)

### b.    Defendant Willis' Statements

Defendant Willis contends that statements she made during the traffic stop are inadmissible because she was not advised of her Miranda rights and because the statements were involuntary. [Doc. 129]. Because Defendant was not subjected to custodial interrogation during the traffic stop and because nothing about the circumstances of the stop were coercive, the court finds that Defendant's statements to the troopers are admissible.[43]

In Miranda v. Arizona, 86 S. Ct. 1602 (1966), the Supreme Court held that "a person questioned by law enforcement officers after being 'taken into custody or otherwise deprived of his freedom of action in any significant way' must first 'be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed.'" Stansbury v. California, 114 S. Ct. 1526, 1528 (1994) (quoting Miranda, 86 S. Ct. at 1612). The Supreme Court recently clarified "that the freedom-of-movement test identifies only a necessary and not a sufficient condition for

---

[43]The court is not aware of any statements made by Defendant Willis that the Government intends to use at trial that occurred after the traffic stop ended and the consensual encounter began on December 3, 2010, or after Defendant was formally placed under arrest.

AO 72A
(Rev.8/82)

Miranda custody." Maryland v. Shatzer, 130 S. Ct. 1213, 1224 (2010). The Court

stated, "We have declined to accord it 'talismanic power,' because Miranda is to be

enforced 'only in those types of situations in which the concerns that powered the

decision are implicated.'"[44] Id. (quoting Berkemer v. McCarty, 104 S. Ct. 3138, 3148-

49 (1984)). Accordingly, "[a]n officer's obligation to administer Miranda warnings

---

[44]Applying this test to an investigative detention, the Eleventh Circuit Court of Appeals explained:

> [A]lthough a reasonable person in the defendant's position may feel constrained not to leave the scene of a police encounter at a particular moment – and thus may be deemed to have been "seized" by law enforcement – he will not necessarily be considered in "custody" for Fifth Amendment purposes. . . .

> Rather, "a free-to-leave inquiry reveals *only* whether the person questioned was seized.". . . While "seizure is a necessary prerequisite to Miranda, . . . a court must [also] ask whether . . . a reasonable person would have understood his freedom of action to have been curtailed *to a degree associated with formal arrest*."

United States v. Luna-Encinas, 603 F.3d 876, 881 (11th Cir. 2010) (citations omitted; emphasis in original); see also United States v. Ellison, 632 F.3d 727, 729 (1st Cir. 2010) ("in dealing with a case outside the Miranda paradigm [that is, interrogation of a suspect at the police station], it is essential to recall that 'the freedom-of-movement test identifies only a necessary and not a sufficient condition for Miranda custody[,]'" the district court explained, "[t]hat is, custody under Miranda means a suspect is not free to go away, but a suspect's lack of freedom to go away does not necessarily mean that questioning is custodial interrogation for purposes of Miranda") (quoting Shatzer, 130 S. Ct. at 1224).

attaches . . . 'only where there has been such a restriction on a person's freedom as to render him in custody.'" Stansbury, 114 S. Ct. at 1528 (quoting Oregon v. Mathiason, 97 S. Ct. 711, 714 (1977) (per curiam)); accord United States v. Brown, 441 F.3d 1330, 1347 (11th Cir. 2006).

This determination "depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned."[45] Stansbury, 114 S. Ct. at 1529; accord United States v. Beltran, 367 Fed. Appx. 984, 988 (11th Cir. 2010) ("Because the test is objective, the subjective beliefs of the defendant and the interviewing officer on whether the defendant was free to leave is irrelevant."), judgment vacated and case remanded on other grounds, 131 S. Ct. 899 (2011); United States v. Street, 472 F.3d 1298, 1309 (11th Cir. 2006) (same).

_____

[45]While "[a]n officer's knowledge or beliefs may bear upon the custody issue if they are conveyed, by word or deed, to the individual being questioned[,]" Stansbury, 114 S. Ct. at 1529-30, "[a] policeman's unarticulated plan has no bearing on the question whether a suspect was in custody at a particular time . . .," United States v. Lall, 607 F.3d 1277, 1284 (11th Cir. 2010) (citation and internal quotation marks omitted). Defendant Willis appears to focus on the facts that the traffic stop was initiated by the DEA agents and that the troopers were privy to information about the underlying drug investigation suggesting that these facts impact the court's analysis of whether she was in custody. [Doc. 129 at 2-4]. Because there is no evidence in the record that either trooper expressed to her, before she made the statements at issue, that the stop was anything other than a routine traffic stop, these facts are irrelevant to the court's inquiry.

56

"'[U]nder the objective standard, the reasonable person from whose perspective custody is defined is a reasonable innocent person.'" <u>Street</u>, 472 F.3d at 1309 (citation omitted); <u>see also</u> <u>Brown</u>, 441 F.3d at 1347 (same); <u>United States v. Moya</u>, 74 F.3d 1117, 1119 (11th Cir. 1996) ("Whether a defendant knows he is guilty and believes incriminating evidence will soon be discovered is irrelevant.").

The circumstances before the court fall outside "the <u>Miranda</u> paradigm[,]" that is, interrogation of a suspect at the police station, <u>Ellison</u>, 632 F.3d at 729, or similar circumstances establishing the functional equivalent of an arrest requiring <u>Miranda</u> warnings. At the time that Defendant responded to the questions about travel itinerary posed by the troopers, she was not in custody but only being detained during a traffic stop, which the court has already determined did not exceed the scope of a lawful stop to process a traffic violation. (Tr. at 149, 152-53, 161-62, 209, 211-12, 215, 220-24, 292-95, 317-20).

In fact, in <u>Berkemer</u>, the Supreme Court addressed whether during a routine traffic stop a person was "in custody" requiring <u>Miranda</u> warnings. The Court, after evaluating the usual circumstances of such temporary detentions, <u>see</u> 104 S. Ct. at 3148-50, held that the "noncoercive aspect of ordinary traffic stops prompts us to hold that persons temporarily detained pursuant to such stops are not 'in custody' for the

57

purposes of Miranda." Id. at 3150; accord Ubaldo-Viezca, 398 Fed. Appx. at 579

("Ordinary traffic stops do not involve custody for purposes of Miranda, unless the

stopped motorist is subjected to treatment during the traffic stop that amounts to a

restriction of freedom to a degree associated with a formal arrest."); United States v.

Crawford, 294 Fed. Appx. 466, 473 (11th Cir. 2010) (same). Some factors that are

considered in deciding whether restrictions other than typical of a traffic stop impacted

Defendant Willis' freedom in this case are "whether the officers brandished weapons

or touched the defendant, whether the officers used a language or tone indicating that

compliance with their orders could be compelled, and the location and length of the

detention." Ubaldo-Viezca, 398 Fed. Appx. at 579 (citing Luna-Encinas, 603 F.3d at

881).

     Nothing in this record indicates that Defendant Willis was subjected to any

restraint beyond that of a normal traffic stop. The troopers never brandished a weapon.

(Tr. at 228, 292, 323; Gov't Ex. 2). Defendant was never touched or physically

restrained. She remained seated in the F-150 until the traffic stop ended. (Gov't Ex.

2). She did not ask to leave during the time the traffic violation was being processed.

(Tr. at 305). The troopers only asked routine questions about Defendant's identity and

travel. (Tr. at 294-95, 317-19). The tone used by the troopers, although loud due to

58

roadside conditions, was conversational. (Tr. at 229-30, 323-24). And the traffic stop, which lasted approximately fifteen minutes, took place in public, on the side of the expressway. (Tr. at 149, 222; Gov't Ex. 2). The fact that the troopers asked for and briefly held Defendant's driver's license to verify information and run a criminal history check (Tr. at 212-13, 222-23, 320), again part of a routine traffic stop, did not exert any restraint on Defendant not experienced by motorists during all traffic stops. Defendant simply was not "in custody" when asked questions about her identification and travel.

And absolutely nothing in the record indicates that Defendant Willis was coerced into involuntarily responding to the troopers' questions about her identity or travel. The Supreme Court has recognized "that noncustodial interrogation might possibly in some situations, by virtue of some special circumstances, be characterized as one where 'the behavior of . . . law enforcement officials was such as to overbear [the defendant's] will to resist and bring about confessions not freely self-determined. . . .'" Beckwith v. United States, 96 S. Ct. 1612, 1617 (1976) (citation omitted). However, those cases where courts have found confessions to be involuntary "all have contained a substantial element of coercive police conduct." Colorado v. Connelly, 107 S. Ct. 515, 520 (1986). "'Sufficiently coercive conduct normally involves

59

subjecting the accused to an exhaustingly long interrogation, the application of physical force or the threat to do so, or the making of a promise that induces a confession.'" United States v. Thompson, 422 F.3d 1285, 1295-96 (11th Cir. 2005) (citation omitted). And, unlike other cases where police conduct was found oppressive, the troopers did not restrain Defendant and did not use or threaten to use physical punishment. See Connelly, 107 S. Ct. at 520 n.1 (citing Mincey v. Arizona, 98 S. Ct. 2408 (1978) (defendant subjected to four hour interrogation while incapacitated and sedated in intensive-care unit); Greenwald v. Wisconsin, 88 S. Ct. 1152 (1968) (defendant, on medication, interrogated for over eighteen hours without food or sleep); Beecher v. Alabama, 88 S. Ct. 189 (1967) (police officers held gun to the head of wounded confessant to extract confession)). Defendant simply has not established that the troopers engaged in any type of coercive actions during the traffic stop in order to elicit her statements.

The court finds that Defendant Willis was not "in custody" during the traffic stop and, therefore, that Miranda warnings were not required. The court also finds that Defendant's statements were voluntary. For these reasons, the court **RECOMMENDS** that Defendant's motions [Docs. 70, 108, 129] to suppress statements be **DENIED**.

### c. Stop of BMW and Arrest of Defendants Sanchez, Gomez and Camacho

Defendants Sanchez and Camacho, who were passengers in the vehicle, seek to suppress evidence seized from their persons and any statements made as the result of their detention following the stop of the gray BMW in which they were passengers. [Docs. 127, 128].  Defendant Gomez, who was driving the BMW, seeks to suppress evidence seized from a search of the BMW and from his person, as well as any statements made by him, as a result of the same law enforcement activity.  [Doc. 132].  The Government opposes the motions to suppress contending that the agents and TFOs had probable cause to believe that the occupants of the BMW were engaged in criminal activity at the time of the vehicle stop and the arrest of Defendants.[46]  [Doc. 135 at 44-45].  Because, the Government argues, the Defendants were lawfully placed under arrest, the items taken from their persons[47] were seized in searches incident to arrest.

---

[46]Although Defendants' arguments focus on whether a lawful <u>Terry</u> stop was conducted, the Government does not rely on an investigatory stop but apparently concedes that Defendants were arrested when removed from the BMW.  Accordingly, the court will analyze the facts to determine if probable cause existed at the time of the stop of the BMW.

[47]Seized from Defendant Sanchez's person were two cellular telephones, identification, and approximately $2,000 in currency.  (Tr. at 169, 171-72, 175, 194).  Seized from Defendant Gomez's person were identification and approximately $9,000 in currency.  (Tr. at 169, 171, 183, 194).  And seized from Defendant Camacho's

Likewise, the Government contends that the seizure of three cellular telephones from the BMW (Tr. at 169, 174-75, 186, 190-91, 194-95) resulted from a search incident to Defendants' arrests or, in the alternative, was based on probable cause under the automobile exception or pursuant to an inventory search. [Id. at 45-50]. As noted, the Government does not intend to use in its case-in-chief at trial any statements made by these Defendants at trial. (Tr. at 41).

In Craig v. Singletary, 127 F.3d 1030 (11ᵗʰ Cir. 1997), the Eleventh Circuit Court of Appeals stated:

> Probable cause to arrest exists when the facts and circumstances within the collective knowledge of law enforcement officers, or of which they have reasonably trustworthy information, would cause a prudent person to believe that the suspect has committed or is committing an offense. . . . Because "sufficient probability, not certainty, is the touchstone of reasonableness under the Fourth Amendment, . . . probable cause itself is a doctrine of reasonable probability and not certainty[.]"

Id. at 1042 (citations omitted); see also Lindsey, 482 F.3d at 1291 ("Probable cause to arrest exists when the totality of the facts and circumstances support 'a reasonable belief that the suspect had committed or was committing a crime.'"). Thus, "[s]ince a finding of probable cause requires only a probability of criminal activity . . . a court assessing probable cause in hindsight must assess both the totality of the circumstances

_____

person was identification. (Tr. at 169, 194).

AO 72A
(Rev.8/82)

and the inferences that flow from those circumstances." United States v. Wai-Keung, 845 F. Supp. 1548, 1557 (S.D. Fla. 1994), aff'd, 115 F.3d 874 (11th Cir. 1997). Probable cause "'must be judged not with clinical detachment, but with a common sense view to the realities of normal life.'" Craig, 127 F.3d at 1042 (citation omitted).

A law enforcement officer need not resolve all inferences and factual conflicts in favor of the suspect. "An officer's decision to arrest a suspect may be objectively reasonable even though that officer has not specifically discarded every possible non-criminal explanation for the conduct that forms the basis for [the] decision to arrest a suspect." Bailey v. Bd. of Cnty. Comm'rs of Alachua Cnty., Fla., 956 F.2d 1112, 1119 n.5 (11th Cir. 1992). And, in judging those facts and circumstances, the court should view all of the circumstances "in the light of the officers' special training and experience." Smith, 201 F.3d at 1323; accord United States v. Reed, 402 Fed. Appx. 413, 415 (11th Cir. 2010) ("In making these commonsense judgments, '[t]he stopping officer is expected to assess the facts in light of his professional experience. . . .'") (citation omitted); United States v. Knight, 336 Fed. Appx. 900, 902 (11th Cir. 2009) ("Great deference is given to the judgment of trained law enforcement officers on the scene.") (citations and internal quotation marks omitted).

63

With respect to the stop of the BMW and the search of the vehicle and its occupants, Defendant Gomez, as the driver,[48] may challenge both the search of his person and of the vehicle. See United States v. Miller, 821 F.2d 546, 548 (11th Cir. 1987) (finding that driver of borrowed vehicle had a legitimate expectation of privacy in the vehicle); and see United States v. Brown, 203 Fed. Appx. 997, 998 (11th Cir. 2006) (same). However, pursuant to the Supreme Court decision in Brendlin v. California, 127 S. Ct. 2400 (2007), as passengers, Defendants Sanchez's and Camacho's challenge to the stop and search is limited. They acknowledge this fact. [Doc. 128 at 12; Doc. 127 at 5]. In Brendlin, the Supreme Court held that a passenger in an automobile, stopped as the result of a traffic offense, is seized the same as the driver. Accordingly, a passenger in a vehicle stopped for a traffic offense may challenge the constitutionality of the stop. 127 S. Ct. 2406-08, 2410. Defendants may therefore challenge the recovery of any evidence off their persons or statements made as a result of the stop. However, because Defendants have not established a legitimate expectation in the vehicle, they may not challenge the search of the vehicle which

----

[48]As noted *supra*, the Government did not place Defendant Gomez on notice that his "standing" to challenge the search of the BMW was in question prior to or during the evidentiary hearing; therefore, Defendant was not allowed the opportunity to present evidence, in addition to the fact that he was the driver at the time of the stop, establishing his authority to operate the vehicle.

64

resulted in the seizure of the additional cellular telephones.  See United States v. Lee, 586 F.3d 859, 864 (11th Cir. 2009) ("We have held that a 'passenger[ ] in a private car, . . . who has no possessory interest in the automobile, does not have a legitimate expectation of privacy in the interior of the automobile because he does not have the right to exclude others from the car.'") (citations omitted).

The facts and reasonable inferences drawn from those facts, considered in light of the agents' and TFOs' training and experience, provided probable cause to believe that the occupants of the BMW were engaged in criminal activity - the drug transaction involving the four kilograms of cocaine found in the F-150 - at the time of the stop and Defendants' arrests.  As outlined *supra*, law enforcement personnel involved in the investigation believed that 1242 Bailing Drive was a stash house used by an individual named Beto, who had been intercepted during a court authorized wire tap, and trash pulls during the week of December 3, 2010, provided additional indications of narcotics trafficking associated with the residence.  (Tr. at 11-12, 28-35).   On December 3, 2010, DEA agents and TFOs conducted surveillance at the residence. (Tr. at 35, 38).

At 11:45 a.m., TFO Purvines observed the gray BMW back out of the residence's garage and park on the street in front of the residence, and the driver

65

(Defendant Sanchez who was the front seat passenger at the time of the stop) exited the vehicle and entered the residence. (Tr. at 57-58, 83, 92; Gov't Ex. 4). At 11:50 a.m., an orange Yukon arrived at the residence and parked on the street in front of the BMW, and a Hispanic male exited and entered the residence. (Tr. at 59-60; Gov't Ex. 5). At 12:30 p.m., the black F-150 truck arrived at the residence, drove up the driveway as the garage door opened, and entered the garage as the garage door closed behind the vehicle. (Tr. at 60).

After approximately eight minutes, Defendant Camacho (who was the back seat passenger when the BMW was subsequently stopped) exited the residence, entered the BMW, and drove out of the subdivision to a Walgreens on Riverside Parkway, where he parked the BMW and, according to the agents observing him, conducted counter-surveillance looking for law enforcement activity. (Tr. at 61-63, 67, 83, 94, 130; Gov't Exs. 6, 7). At 12:40 p.m., the garage door to the residence opened and the F-150 backed out and left the subdivision. TFO Purvines directed other agents to follow the vehicle, and the troopers were asked to conduct a traffic stop of the F-150 because all of the observations "led agents to believe that this was a classic pick up - drop off narcotics and pick up by a second individual . . . a transaction had occurred" at a location believed to be a stash house. (Tr. at 36-38, 67, 87, 132-33). At 12:45 p.m.,

66

the orange Yukon departed the residence, and a minute later the gray BMW returned, the garage door opened, the BMW entered the garage and the garage door closed, indicating to the agents and TFOs that the drug transaction had been completed. (Tr. at 65-66, 68).

Shortly thereafter, at approximately 12:57 p.m., surveillance agents observed (which can be seen on the traffic stop video) the orange Yukon pass the sight of the GSP traffic stop of the F-150. That information was relayed back to the agents and TFOs conducting surveillance at the residence. (Tr. at 70, 410-12). At 1:10 p.m., the garage door opened and the gray BMW left the residence "at a high rate of speed" traveling to McKendree Church Road where the vehicle stopped at a stop sign. (Tr. at 69, 70-71, 98; Gov't Exs. 6, 7). This sequence of events allows for the reasonable inference that the occupant of the orange Yukon alerted the occupants of the residence that the F-150 had been stopped by state troopers. Accordingly, TFO Purvines followed the BMW and pulled behind the vehicle at the stop sign, where he first observed the back seat passenger, Defendant Camacho, turn around and look at him, and then he observed the driver, Defendant Gomez, and front seat passenger, Defendant Sanchez, also turn to look at him. These actions indicated to the agent that the BMW's occupants knew he was following. (Tr. at 72-73, 98, 100).

67

The BMW made a right hand turn onto McKendree Church Road, driving slowly, until reaching Riverside Parkway, where the BMW stopped, and the occupants again turned to look back at him. The vehicle made a right hand turn onto Riverside Parkway and again sped up. (Tr. at 74-75, 101; Gov't Ex. 7). At the River Exchange Shopping Center, the BMW entered and made a series of turns to circle the shopping center before getting back on Riverside Parkway to continue in the same direction away from the Bailing Drive residence. (Tr. at 75, 102). This conduct, in conjunction with the occupants turning around to look at the TFO and the BMW speeding up and slowing down, indicated to TFO Purvines that Defendants were attempting to elude law enforcement. (Tr. at 78-79). This conclusion was a reasonable inference under the circumstances and was a factor contributing to a finding of probable cause. See United States v. Pantoja-Soto, 739 F.2d 1520, 1523-24 (11th Cir. 1984) (finding that a defendant's presence at a location where drugs were being sold in conjunction with his flight upon the arrival of law enforcement officers established probable cause to believe the defendant "was in some way involved in the drug transaction"); accord United States v. Mitchell, 407 Fed. Appx. 407, 410 (11th Cir. 2011) ("Evasive behavior[, in and of itself,] is a 'pertinent factor'" in establishing a reasonable suspicion of criminal conduct); United States v. Gordon, 231 F.3d 750, 757 (11th Cir.

68

2000) (unprovoked flight may be considered as evidence of wrongdoing and contribute to finding of reasonable suspicion).

At Old Norcross Road, the BMW turned left and continued over Sugarloaf Parkway until the vehicle reached Cruse Road and made a left hand turn onto that road. (Tr. at 75-76, 103; Gov't Ex. 7). At some point between Sugarloaf Parkway and Cruse Road, TFO Purvines and other agents and TFOs, who had joined him, were advised over the radio that four kilograms of cocaine had been found in the center console of the F-150. (Tr. at 75-76, 80, 105). The decision was made that the BMW should be stopped and the occupants detained. (Tr. at 105). TFO Purvines testified that the totality of the circumstances led him to believe Defendants were involved in a drug transaction. (Tr. at 115). The court agrees. The facts and circumstances known to the agents and TFOs "would cause a prudent person to believe that [Defendants] ha[ve] committed or [are] committing an offense. . . ." Craig, 127 F.3d at 1042.

Because the agents and TFOs had probable cause to arrest the occupants of the gray BMW, the search of each Defendant's person as he was removed from the BMW and frisked, resulting in the seizure of identification, cellular telephones and currency off Defendant Sanchez's person, identification and currency off Defendant Gomez's person, and identification off Defendant Camacho's person (Tr. at 80-81, 83-84, 110,

69

113, 121-22, 168-73, 182-86, 190-92, 194-95), were lawful searches incident to the arrest of each Defendant. The items seized are admissible into evidence. See United States v. Robinson, 94 S. Ct. 467 (1973); Chimel v. California, 89 S. Ct. 2034 (1969).

For these reasons, the court **RECOMMENDS** that Defendants Gomez's, Sanchez's and Camacho's motions [Docs. 64, 71, 86] to suppress evidence seized from their persons be **DENIED**.

### d.    Warrantless Search of BMW

Defendant Gomez also challenges the subsequent search of the BMW and seizure of the three additional cellular telephones from the passenger compartment. The Government first argues that the seizure of those items was a lawful search of the vehicle incident to arrest pursuant to Arizona v. Gant, 129 S. Ct. 1710 (2009). [Doc. 135 at 45-47]. In Gant, the Court held that the decision in Chimel v. California, *supra*, upon which the search incident to arrest exception is originally based,[49] "authorizes

---

[49]One of the exceptions to the warrant requirement includes vehicle searches conducted incident to arrest. See New York v. Belton, 101 S. Ct. 2860, 2864 (1981). The Eleventh Circuit Court of Appeals, as was true in many circuits, had interpreted the Belton decision to allow the warrantless search of the passenger compartment and containers therein of a vehicle in which the arrestee had been a recent occupant regardless of whether the arrestee was secured and no longer in the immediate area of the vehicle. See United States v. Gonzalez, 71 F.3d 819, 825-26 (11th Cir. 1996) (because defendant had been an occupant of the vehicle, a search of the passenger compartment and containers was lawful as a search incident to arrest). The Supreme

police to search a vehicle incident to a recent occupant's arrest only when the arrestee is unsecured and within reaching distance of the passenger compartment at the time of the search." Gant, 129 S. Ct. at 1719. The Court also held that, although not following from Chimel, "circumstances unique to the vehicle context justify a search incident to a lawful arrest[, even though the arrestee is secured away from the vehicle,] when it is 'reasonable to believe evidence relevant to the crime of arrest might be found in the vehicle.'" Id. (quoting Thornton v. United States, 124 S. Ct. 2127, 2127 (2004)). Elaborating on this aspect of the exception, the Court stated, "In many cases, as when a recent occupant is arrested for a traffic violation, there will be no reasonable basis to believe the vehicle contains relevant evidence. . . . But in others, including Belton and Thornton, the offense of arrest[, i.e., drug offenses,] will supply a basis for searching the passenger compartment of an arrestee's vehicle and any contents therein." Id.; accord United States v. Lightbourn, 357 Fed. Appx. 259, 264 (11th Cir. 2009) ("If the offense of arrest supplies a basis for a search incident to arrest[, such as a drug offense], the officer may search 'the passenger compartment of an arrestee's vehicle and any containers therein.'") (citation omitted).

_____

Court in Gant clarified the scope for the application of Belton.

While the drug offense for which Defendants were arrested would provide a

basis to search the BMW regardless of the fact that they were secured, the court does

not necessarily agree with the Government that the delay in conducting such a search

incident to arrest, occurring in this case after the BMW was transported back to Bailing

Drive (Tr. at 169, 195, 404-05), falls within the scope of a search incident to arrest

under Gant.[50]  However, the Government correctly argues that the search of the BMW

---

[50]Although case law both before and after the Supreme Court's decision in Gant
has allowed some elapse of time between securing a defendant from a vehicle and a
search of the passenger compartment of the vehicle incident thereto, see United States
v. Willis, 37 F.3d 313, 317-18 (7th Cir. 1994) (finding that search of vehicle was not
delayed an inordinate amount of time - in that case, apparently for a few minutes while
the officer looked for a camera and obtained a towing slip for the vehicle); Diaz-
Lizaraza, 981 F.2d at 1222 n.3 (allowing brief interruption of search of vehicle's
passenger compartment for officer to move his patrol vehicle); United States v.
Greenwood, 2010 WL 5067912, at *7 (D. Ak. December 7, 2010) (noting there is no
outer limit for the time between an arrest and a search of a vehicle incident thereto, and
citing prior case allowing a fifteen minute interval, the court upheld delay while
arresting officer waited for back-up to arrive), other cases have held that delay and
moving the object of the search to another location, such as police station, were not
sufficiently contemporaneous with arrest to constitute a search incident thereto, see
United States v. Wells, 347 F.3d 280, 287 (8th Cir. 2004) (refusing to sanction search
of vehicle which apparently occurred after vehicle had been returned to police station
as one incident to arrest); United States v. Gomez, __ F. Supp. 2d __, 2011 WL
3841071, at **7, 11-12 (S.D. Fla. August 31, 2011) (noting that the "'temporal and
spatial limitation on searches incident to arrest,'" require searches that are
"'substantially contemporaneous with the arrest'" and are "confined to the immediate
vicinity of the arrest[,]'" the court noted that if the search in question had not occurred
until later at the station house, the officers' "search would have run afoul with the
spatial and temporal safeguards" imposed) (citations omitted).

AO 72A
(Rev.8/82)

was a lawful search pursuant to the automobile exception or as an inventory search. [Doc. 135 at 49-50]. As the agents and TFOs were removing Defendants Gomez and Sanchez from the front seat of the BMW, they observed two cellular telephones in the center console but did not seize the items at that time. (Tr. at 83, 84, 110, 168-69, 173-74, 186, 195). And, as Defendant Camacho was removed from the rear seat of the BMW, on the seat, near where Defendant Camacho had been sitting, the agents and TFOs observed another cellular telephone that was not seized at that point. (Tr. at 168-69, 175, 191-92, 194).

At the direction of the DEA supervisor, Special Agent Robert Snyder, all three Defendants and the BMW were returned to the residence at Bailing Drive. (Tr. at 187, 404). Due to the fact that he needed the agents and TFOs back at the residence, Special Agent Snyder instructed an agent to drive the vehicle back and to bring Defendants. (Tr. at 404-05). The BMW was subject to forfeiture for facilitating a drug transaction, that is, being used for counter-surveillance. (Tr. at 200-01, 404). Because the vehicle was being seized, Agent Snyder directed that the vehicle's contents be inventoried, pursuant to DEA's policy, before the tow truck arrived and agents lost control over the vehicle. (Tr. at 403-06; Gov't Ex. 23). A vehicle inventory is conducted to protect DEA from liability for damaged or lost contents. (Tr. at 201-02). The only items that

were apparently found in the BMW were the three cellular telephones previously observed when Defendants were removed from the vehicle. (Tr. at 195, 406).

In <u>Carroll v. United States</u>, 45 S. Ct. 280, 285 (1925), the Supreme Court established an exception to the warrant requirement for searches of automobiles and other moving vehicles. Under the "automobile exception," "[i]f a car is readily mobile and probable cause exists to believe it contains contraband, the Fourth Amendment . . . permits police to search the vehicle without more." <u>Pennsylvania v. Labron</u>, 116 S. Ct. 2485, 2487 (1996); <u>see also</u> <u>Lindsey</u>, 482 F.3d at 1293 ("The requirement of mobility is satisfied merely if 'the automobile is operational.'") (citation omitted). No separate exigent circumstances need to be shown. <u>See</u> <u>Maryland v. Dyson</u>, 119 S. Ct. 2013, 2014 (1999); <u>United States v. Watts</u>, 329 F.3d 1282, 1286 (11th Cir. 2003) ("[T]his Court made it 'clear that the requirement of exigent circumstances is satisfied by the ready mobility *inherent* in all automobiles that reasonably appear to be capable of functioning.'") (quoting <u>United States v. Nixon</u>, 918 F.2d 895, 903 (11th Cir. 1990)) (emphasis in original).

There is no dispute that the BMW was readily mobile as it was driven by the Defendants that day and by the agents back to the residence. Accordingly, the validity of the search turns on whether there was probable cause to believe the vehicle

74

contained contraband or evidence of a crime. <u>Dyson</u>, 119 S. Ct. at 2014; <u>see also</u> <u>Lindsey</u>, 482 F.3d at 1293 ("The key issue here is whether the police had probable cause for the search and seizure of the vehicle."). "Probable cause for a search exists when under the totality of the circumstances there is a fair probability that contraband or evidence of a crime will be found in a particular place." <u>United States v. Magluta</u>, 418 F.3d 1166, 1182 (11th Cir. 2005) (citations and internal quotation marks omitted).

The court has already outlined the facts establishing probable cause to believe that the occupants of the vehicle were engaged in the transaction involving the four kilograms of cocaine and that the BMW was utilized for counter-surveillance during the transaction, as well as by Defendants to attempt to flee, having apparently been informed of the traffic stop involving the F-150. Additionally, the agents' and TFOs' observations of the cellular telephones in the vehicle at the time of arrest establish probable cause that evidence or instrumentalities of the drug trafficking activities would be found in the vehicle. <u>See, e.g.</u>, <u>United States v. Correa</u>, 347 Fed. Appx. 541, 545 (11th Cir. 2009) (finding that in executing search warrant the agents "reasonably concluded that [the defendant's] cellular telephone, a 'known tool of the drug trade,' contained digital evidence about the conspiracy") (citation omitted); <u>United States v. Ordonez</u>, 737 F.2d 793, 810 (9th Cir. 1984) (allowing officer executing search warrant

to answer incoming telephone calls at residence because "the telephone is 'highly necessary' to the illicit business conducted on the premises") (citation omitted); <u>United States v. Meador</u>, 2008 WL 4922001, at *15 (E.D. Mo. January 7, 2008) ("Cellular phones are well-known and recognized tools of the drug dealing trade."). There was probable cause to search the BMW and seize the cellular telephones found therein.

Delaying the search until the BMW was moved to the residence does not impact the court's decision. In <u>United States v. Johns</u>, 105 S. Ct. 881 (1985), the Supreme Court held that a warrantless search of packages suspected of containing controlled substances which had been removed from a vehicle based on a search under the automobile exception to the warrant requirement was not "unreasonable merely because it occurred three days after the packages were unloaded from the pickup trucks." <u>Id.</u> at 884-85. The court stated, "There is no requirement that the warrantless search of a vehicle occur contemporaneously with its lawful seizure."[51] <u>Id.</u> at 885; <u>accord</u> <u>Lindsey</u>, 482 F.3d at 1293; <u>United States v. Weber</u>, 808 F.2d 1422, 1425 (11th Cir. 1987).

---

[51]The Supreme Court did note that officers may not indefinitely delay a search and that a delay may become unreasonable if the owner establishes that "it adversely affected a privacy or possessory interest." <u>Id.</u> at 887.

76

Finally, the search of the BMW was a lawful inventory search due to the fact that the vehicle was seized for forfeiture. See Colorado v. Bertine, 107 S. Ct. 738, 741 (1987). The inventory search of the BMW was conducted according to standardized criteria contained in the DEA inventory policy. (Gov't Ex. 23). See Florida v. Wells, 110 S. Ct. 1632, 1635 (1990). While "an inventory search must not be a ruse for a general rummaging in order to discover incriminating evidence[,]" id.; see also Bertine, 107 S. Ct. at 741 (approving an inventory search where there had been "no showing that the police, who were following standardized procedures, acted in bad faith or for the sole purpose of investigation"), nothing in the record indicates that the agents and TFOs failed to followed the policy or conducted the inventory solely as an investigative tool. (Tr. at 195, 201-02, 403-06). Therefore, the cellular telephones were also properly seized pursuant to the inventory of the BMW.

For these reasons, the court **RECOMMENDS** that Defendant Gomez's motion [Doc. 71] to suppress evidence taken from the BMW be **DENIED**.

### Search Warrant

Defendants Sanchez and Gomez seek to suppress evidence seized, a small amount of cocaine, a handgun and ammunition, during the execution of a federal search warrant at 1242 Bailing Drive. Defendants contend that the affidavit in support

77

of the warrant does not establish probable cause linking the residence to the alleged criminal conduct. [Docs. 72, 87; Gov't Ex. 13]. The Government opposes the motions to suppress arguing that probable cause is established and, in the alternative, that the good faith exception applies. [Doc. 135 at 53-54].

## I.    Affidavit for Search Warrant

The affiant, T.K. Gordon, a TFO with DEA since 1996, is a Sergeant in the Special Investigations Section of the Doraville Police Department where he has been employed since 2004, and he has prior law enforcement experience with other police departments for over eight years. (Gov't Ex. 13, Affidavit, ¶ 3). The affiant explained that he has conducted or participated in hundreds of investigations of drug trafficking organizations, including involving wire intercepts. And, based on his experience in these investigations, the affiant stated that he is "familiar with the methods of operation typically utilized by drug traffickers" and "the methods used by drug traffickers to thwart detection, arrest and lawful proof of evidence of their wrongful activities." (Id., ¶ 4). He next outlined the source of the information set forth in the affidavit, that is, wire intercepts, discussions with other law enforcement personnel involved in the investigation, and review of reports of investigating and surveillance agents and officers. (Id., ¶¶ 5, 6).

AO 72A
(Rev.8/82)

The affiant then summarized the information obtained from the court authorized wire intercept conducted by DEA in Charleston, South Carolina, which led to the identification of Beto in Atlanta, who was the source of supply for kilogram quantities of cocaine for the South Carolina targets. (Id., ¶ 8). He stated that the target premises, that is, 1242 Bailing Drive, was identified using GPS data obtained from Beto's telephones and that a trash pull on November 17, 2010, at the residence had uncovered a number of receipts for cash purchases, typical of drug traffickers whose business generates a lot of cash and who make cash purchases to avoid a paper trail, and of other documents which linked the location to another known drug trafficker and included a telephone number often called by a telephone used by Beto. (Id., ¶¶ 8, 9).

The affiant then set forth the events of December 3, 2010, involving the movements of the gray BMW, the arrival of the orange Yukon (referred to as an SUV), and the Ford F-150 at the residence. (Id., ¶ 10). The affiant explained the meaning of these events based on his training and experience, that is, "people involved in the drug trade conducting drug or money pickups or drop offs commonly do so by pulling their vehicles into garages to prevent law enforcement personnel and other witnesses from observing the transaction." (Id.). The affiant included the fact of the traffic stop of the F-150 after it left the residence resulting in the seizure of the four kilograms of cocaine.

(Id.).  He also included the fact that the orange SUV drove by the scene of the traffic stop and that shortly thereafter the BMW left the residence occupied by three Hispanic males.  (Id., ¶ 11).  He stated, based on his training and experience, "that the occupants of the grey BMW and orange SUV were acting as countersurveillance for drug trafficking activities occurring within the" residence.  (Id.).

## II.    Discussion

In deciding whether to sign a search warrant, the issuing judge is "'simply to make a practical, commonsense decision whether, given all the circumstances set forth in the affidavit before him, including the veracity and the basis of knowledge of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place.'"  United States v. Jiminez, 224 F.3d 1243, 1248 (11th Cir. 2000) (quoting Illinois v. Gates, 103 S. Ct. 2317, 2332 (1983))(internal quotation marks omitted).  In this regard, "'probable cause is a fluid concept – turning on the assessment of probabilities in particular factual contexts[.]'"  United States v. Brundidge, 170 F.3d 1350, 1352 (11th Cir. 1999) (quoting Gates, 103 S. Ct. at 2329).  For this reason, "[c]ourts reviewing the legitimacy of search warrants should not interpret supporting affidavits in a hypertechnical manner; rather, a realistic and commonsense approach should be employed so as to encourage recourse to the

AO 72A
(Rev.8/82)

warrant process and to promote the high level of deference traditionally given to magistrates in their probable cause determination." United States v. Miller, 24 F.3d 1357, 1361 (11th Cir. 1994) (citing Gates, 103 S. Ct. at 2331-32; United States v. Ventresca, 85 S. Ct. 741, 746 (1965)); accord United States v. Hatcher, 300 Fed. Appx. 659, 663 (11th Cir. 2008) (same). In reviewing the issuance of the search warrant, the undersigned must determine only that the Magistrate Judge had a "substantial basis" for concluding that probable cause existed to uphold the warrant. See Gates, 103 S. Ct. at 2331; see also Massachusetts v. Upton, 104 S. Ct. 2085, 2085 (1984) (per curiam). The validity of the warrant is considered based on the totality of the circumstances. See Brundidge, 170 F.3d at 1352.

"Probable cause to search a residence requires some nexus between the premises and the alleged crime." United States v. Bradley, 644 F.3d 1213, 1263 (11th Cir. 2011) (citing United States v. Jenkins, 901 F.2d 1075, 1080-81 (11th Cir. 1990)). The Eleventh Circuit Court of Appeals further stated in Bradley, "'The nexus between the objects to be seized and the premises searched can be established from the particular circumstances involved and need not rest on direct observation.'" Id. (quoting Jenkins, 901 F.2d at 1080-81) (citation and alteration omitted)). In this regard, "a police officer's expectation, based on prior experience and the specific circumstances of the

81

alleged crime, that evidence is likely to be found in a suspect's residence satisfies probable cause." Id. at 1263-64; see also United States v. Robinson, 62 F.3d 1325, 1331 n.9 (11th Cir. 1995) (opinions and conclusions of experienced agents regarding facts are properly considered in determining probable cause); United States v. Magluta, 44 F.3d 1530, 1535 (11th Cir. 1995) (same); United States v. Espinosa-Orlando, 704 F.2d 507, 511 (11th Cir. 1983) (same). Accordingly, based on the expertise and experience of officers and agents, "even seemingly innocent activity may provide a basis for finding probable cause." United States v. Dickey-Bey, 393 F.3d 449, 454 (4th Cir. 2004) (citations and internal quotation marks omitted); see also United States v. Sparks, 291 F.3d 683, 688 (10th Cir. 2002) (the court found that, although the defendant's actions "could theoretically have been innocent, . . . a prudent, cautious and trained police officer more likely would have construed those actions" as involvement in the criminal activity under investigation); United States v. Pena-Rodriguez, 110 F.3d 1120, 1131 (5th Cir. 1997) (rejecting the defendant's contentions that his conduct was consistent with that of an innocent person, the court found the argument unavailing, noting that "[b]oth the Supreme Court and this circuit have recognized that 'innocent behavior frequently will provide the basis for a showing of probable cause'") (citations omitted).

AO 72A
(Rev.8/82)

The affidavit established a nexus between the criminal activity, drug trafficking, and the residence associated with the targets of that activity, including Beto, as well as establishing a link between the residence and the four kilograms of cocaine discovered in the F-150. The wire intercepts, along with the GPS analysis, and the trash pulls linked the residence to Beto who was under investigation as the source of supply for kilogram quantities of cocaine. (Gov't Ex. 13, Affidavit, ¶¶ 8, 9). Having identified the residence, surveillance was conducted on December 3, 2010, at that location which resulted in the agents observing what the affiant concluded was either a drug or money drop off or pickup. (Id., ¶ 10). Affiant explained that the timing of movement of the vehicles and the arrival of the F-150, including the truck entering the just vacated garage and the door closing as it entered, singled to him - based on his training and experience - that the participants in a drug related transaction were attempting to conceal their conduct. (Id.). The movements of other vehicles while the F-150 was in the garage and after the F-150 left the residence also signified to the affiant that these vehicles were conducting counter-surveillance in connection with the drug transaction. (Id., ¶ 11). These facts, and the reasonable inferences drawn from the facts by the affiant, established a "fair probability" that evidence related to drug trafficking activity would be found inside the 1242 Bailing Drive residence.

83

And, even if the affidavit did not establish probable cause, the evidence seized

should not be suppressed. The court agrees with the Government that the good faith

exception to the exclusionary rule should be applied to this case. In <u>United States v.

Leon</u>, 104 S. Ct. 3405 (1984), and <u>Massachusetts v. Sheppard</u>, 104 S. Ct. 3424 (1984),

the Supreme Court established a good faith exception to the exclusionary rule where

officers placed reasonably objective reliance on a search warrant later determined to

be defective. In <u>United States v. Accardo</u>, 749 F.2d 1477 (11th Cir. 1985), the Eleventh

Circuit Court of Appeals discussed the good faith exception established by the

Supreme Court. With the exception of cases "where the issuing magistrate wholly

abandoned his judicial role[,]" or where "a warrant [is] based on an affidavit 'so

lacking in indicia of probable cause as to render official belief in its existence entirely

unreasonable[,]'" or where "a warrant may be so facially deficient – i.e., in failing to

particularize the place to be searched or the things to be seized – that the executing

officers cannot reasonably presume it to be valid[,]" the good faith exception applies.

<u>Id.</u> at 1480 & n.4 (citations omitted). The good faith exception "require[s] suppression

'only if the officers were dishonest or reckless in preparing their affidavit or could not

have harbored an objectively reasonable belief in the existence of probable cause.'"

<u>Id.</u> at 1480 (quoting <u>Leon</u>, 104 S. Ct. at 3422). In making this decision, the totality of

84

the circumstances surrounding issuance of the search warrant may be considered. <u>Id.</u> at 1481.

Defendants' only potential attack on the applicability of the good faith doctrine would fall within the third exception, that is, that the warrant was "based on an affidavit 'so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable[.]'" <u>Leon</u>, 104 S. Ct. at 3421 (citation omitted). Such an attack would lack merit. First, the court notes that the affidavit supporting the search warrant was not a "'bare-bone' statement of nothing more than conclusory allegations" which the Supreme Court in <u>Leon</u> found indicative of warrants falling within the third exception to the good faith doctrine. <u>See</u> <u>Glinton</u>, 154 F.3d at 1257. As set out *supra*, this affidavit presented much more than conclusory, "bare-bone" assertions for consideration by the Magistrate Judge. The affidavit provided factual details for the Magistrate Judge to consider and evaluate. The agents were, therefore, entitled to rely upon his evaluation and determination that "given all the circumstances set forth in the affidavit before him, there [was] a fair probability that contraband or evidence of a crime [would] be found in a particular place." <u>Gates</u>, 103 S. Ct. at 2332.

85

For these reasons, the court **RECOMMENDS** that Defendants Sanchez's and Gomez's motions [Docs. 72 and 87] to suppress evidence obtained from the residence be **DENIED**.

## Motion to Sever

Defendant seeks pursuant to Fed. R. Crim. P. 14 to sever the trial of his case from that of co-Defendants Sanchez, Gomez and Camacho. [Doc. 105]. Defendant contends that due to the overwhelming amount of evidence, including wire intercepts that do not involve him, against Defendants Sanchez, Gomez and Camacho, the "spillover" of that evidence will unfairly prejudice him. [Docs. 105, 139]. The Government opposes the motion to sever. [Doc. 138].

Defendant seeks a severance based on Fed. R. Crim. P. 14. "Rule 14(a) states, 'If the joinder of . . . defendants in an indictment . . . appears to prejudice a defendant or the government, the court may . . . sever the defendants' trials, or provide any other relief that justice requires.'" United States v. Blankenship, 382 F.3d 1110, 1120 (11th Cir. 2004) (citation omitted). The Eleventh Circuit Court of Appeals further stated, "We have long recognized that 'a District Court confronted with a Rule 14 Motion for Severance is required to balance any . . . prejudice [to the defendants] against the interests of judicial economy, a consideration involving substantial discretion.'" Id.

AO 72A
(Rev.8/82)

(citation omitted). "In practice, the general rule is that defendants who are jointly indicted should be tried together, particularly in conspiracy cases." United States v. Baker, 432 F.3d 1189, 1236 (11th Cir. 2005); see also United States v. Browne, 505 F.3d 1229, 1268 (11th Cir. 2007) (same). To justify severance, a defendant must show compelling prejudice to the conduct of his or her defense resulting in fundamental unfairness. See Baker, 432 F.3d at 1236; United States v. Schlei, 122 F.3d 944, 984 (11th Cir. 1997). "'This is a heavy burden, and one which mere conclusory allegations cannot carry.'" United States v. Walser, 3 F.3d 380, 386 (11th Cir. 1993) (quoting United States v. Hogan, 986 F.2d 1364, 1375 (11th Cir. 1993)); see also Browne, 505 F.3d at 1268.

Defendant is charged in a conspiracy to possess with the intent to distribute a controlled substance, that is, the four kilograms of cocaine found in the F-150 that he was driving on December 3, 2010, as well as with possession with the intent to distribute that cocaine. [Doc. 1]. It is the general rule in conspiracy cases that "defendants indicted together should be tried together." United States v. Cassano, 132 F.3d 646, 651 (11th Cir. 1998); see also Browne, 505 F.3d at 1268 (noting that it "is particularly true in conspiracy cases" that persons indicted together be tried together); United States v. Gossett, 877 F.2d 901, 904 (11th Cir. 1989) ("Generally,

coconspirators should be tried jointly."). In order to overcome this presumption and to establish that severance of Defendants is mandated pursuant to Rule 14, Defendant must not only show specific prejudice but also that "'there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence.'" <u>Blankenship</u>, 382 F.3d at 1123 (citation omitted). Defendant does not make any argument that a specific trial right will be compromised by a joint trial. [Docs. 105, 139].

The second category mandating a severance, that is, preventing the jury from making a reliable judgment, applies generally to three situations. "First, severance is mandated where compelling evidence that is not admissible against one or more of the co-defendants is to be introduced against another co-defendant." <u>Blankenship</u>, 382 F.3d at 1123. However, this situation does not involve the mere disparity in the quality or amount of evidence introduced against one or more defendants and only applies where there is a minimal chance that limiting instructions will provide adequate relief. <u>See</u> <u>Baker</u>, 432 F.3d at 1236 (holding that "a defendant does not suffer 'compelling prejudice simply because much of the evidence at trial is applicable only to his codefendants,' . . . even when the disparity is 'enormous'") (quoting <u>Schlei</u>, 122 F.3d at 984). Severance is also mandated upon a showing of prejudice "in an extremely

88

narrow range of cases in which the sheer number of defendants and charges with different standards of proof and culpability, along with the massive volume of evidence, makes it nearly impossible for a jury to juggle everything properly and assess the guilt or innocence of each defendant independently." Blankenship, 382 F.3d at 1124. And, "[f]inally, severance is required . . . where one defendant is being charged with a crime that, while somehow related to the other defendants or their overall criminal scheme, is significantly different from those of the other defendants." Id. at 1125. None of these situations apply in this case.

Defendant simply ignores the fact that he (and Defendant Willis) of all Defendants named in the indictment were in possession of the four kilograms of cocaine - no other evidence need be introduced besides the events of December 3, 2010, to link Defendant to the conspiracy to possess or to possession of the cocaine. Accordingly, the court fails to see how introduction of additional evidence, which is quite probably necessary to link the remaining Defendants to the drugs, can have any prejudicial effect on Defendant. Additionally, numerous Eleventh Circuit and former Fifth Circuit cases have rejected severance requests based on similar claims that the complexity of the charges, length of trial and number of defendants and counts will result in prejudice and found that limiting instructions mitigated against defendants

89

demonstrating compelling prejudice.[52]  See, e.g., United States v. Starrett, 55 F.3d 1525, 1553 (11th Cir. 1995); United States v. Russo, 796 F.2d 1443, 1449-50 (11th Cir. 1986); Kopituk, 690 F.2d at 1320; United States v. Martino, 648 F.2d 367, 385-86 (5th Cir. 1981).  Thus, Defendant has not established that a severance is required based on his claims of prejudice.

For these reasons, the court **RECOMMENDS** that Defendant Crowell's motion [Doc. 105] for severance be **DENIED**.

---

[52]The court also notes that much of Defendant's argument for severance is based on his guess-work as to what evidence the Government will introduce at trial.  [Doc. 139 at 5-7].  Such speculation is not sufficient for the court to grant a severance. Further, the court notes that if compelling prejudice is established at any point in time, discretion may be exercised by the trial court before or even during trial to grant a severance.  See United States v. Pedrick, 181 F.3d 1264, 1272 (11th Cir. 1999) (based on its continuing duty to grant a severance when compelling prejudice is demonstrated, trial court granted a severance of a defendant during the course of trial); United States v. Kopituk, 690 F.2d 1289, 1316 (11th Cir. 1982) ("[T]he court fulfilled its 'continuing duty at all stages of the trial to grant a severance if prejudice does appear.'") (quoting Schaffer v. United States, 80 S. Ct. 945, 948 (1960)).  Although the record presented to the court at this stage of the proceedings does not support a grant of a severance, Defendant may renew the severance motion at any time upon a demonstration that denial of the motion would subject him to compelling prejudice such as could not be cured with proper jury instructions.  See United States v. Hersh, 297 F.3d 1233, 1244 (11th Cir. 2002) (observing "that the district court affirmatively and repeatedly acted to reduce any unfair prejudice[,]" particularly instructing the jury on the limitation on the consideration of evidence as to each count of the indictment, appellate court found no error in refusal to grant Rule 14 severance); Walser, 3 F.3d at 387 ("[I]f the possible prejudice may be cured by a cautionary instruction severance is not required.")

AO 72A
(Rev.8/82)

## Conclusion

For the foregoing reasons and cited authority, the court **RECOMMENDS** that Defendants Sanchez's, Gomez's, Camacho's, Crowell's, and Willis' motions [Doc. 64, 68, 69, 70, 71, 72, 86, 87, 103, 108, an 129] to suppress evidence and statements be **DENIED** and that Defendant Crowell's motion [Doc. 105] for severance be **DENIED**.

There are no other pending matters before the Magistrate Judge, and the undersigned is aware of no problems relating to the scheduling of this case.

**IT IS THEREFORE ORDERED** and **ADJUDGED** that this action be and the same is hereby, declared Ready for Trial as to all Defendants.

**IT IS SO RECOMMENDED AND ORDERED** this 28th day of November, 2011.

JANET F. KING
UNITED STATES MAGISTRATE JUDGE

AO 72A
(Rev.8/82)