# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | |
| | : | |
| HUMBERTO SANCHEZ- | : | CRIMINAL ACTION NO. |
| TAMAYO, a/k/a  BETO, ISIDRO | : | |
| GOMEZ-PENALOZA, JUAN | : | 1:10-cr-00532-JOF -JFK (1-5) |
| CAMACHO-PINEDA, EDD | : | |
| CROWELL, and JESSICA WILLIS, | : | |
| | : | |
| Defendants. | : | |

## ORDER

This matter is before the court on Magistrate Judge Janet F. King's Report and Recommendation [140], which recommends that the court deny all of the defendants' motions to suppress [64] [68] [69] [70] [71] [72] [86] [87] [103] [108] [129] and Defendant Edd Crowell's motion for severance of Defendants [105], and Defendant Crowell's Objections thereto [144], Defendant Isidro Gomez-Penzaloza's Objections thereto [145], and Defendant Humberto Sanchez-Tamayo's Objections thereto [146].

## I. Background

### A. Facts

This case arises out of Drug Enforcement Agency ("DEA") and local law enforcement's surveillance of certain property in Georgia and subsequent arrest of

Defendants for drug offenses. The pertinent facts are drawn from Magistrate Judge King's Report and Recommendation ("R&R") and are as follows.

On December 3, 2010, DEA agents and Task Force Officers were conducting surveillance at 1242 Bailing Drive, Lawrenceville, Georgia, based on information obtained from court authorized wiretaps conducted by federal agents in South Carolina. According to DEA Special Agent Darren Krawczyk, the South Carolina investigation overlapped with another investigation he was conducting in Atlanta, and both involved an individual from South Carolina traveling to the Atlanta area to take delivery of cocaine. As a result, agents identified a location where the drug transactions took place, arrested two individuals, and seized large amounts of cocaine and methamphetamine. Thereafter, intercepted conversations on the South Carolina wiretap identified a person named Beto as the new contact for quantities of cocaine. Agents were then able to use GPS tracking of Beto's cellular telephones to identify 1242 Bailing Drive as his residence. A couple weeks before December 3, 2010, agents conducted trash pulls at the residence and obtained information corroborating the association of drug suspects with the residence. More specifically, agents recovered receipts showing cash purchases and letters and a receipt bearing the name Osbaldo Jimenez-Ruis, someone that DEA records identified as providing a sample of crystal methamphetamine to an undercover agent for testing in a different investigation. Government's Exh. 13, at 6. Accordingly, agents believed the location to be a stash house

for cocaine and, on December 3, 2010, were attempting to obtain a federal search warrant for the residence.

On December 3, 2010, Task Force Officer Leonard Purvines was tasked with keeping an eye on individuals and vehicles coming to and leaving from the residence. At 11:45 a.m., Task Force Officer Purvines observed a gray BMW back out of the garage and park on the street in front of the house. A Hispanic male, later determined to be Defendant Sanchez-Tamayo ("Sanchez"), exited the vehicle and entered the residence. At 11:50 a.m., an orange Yukon arrived at the residence and parked on the street in front of the BMW, and a Hispanic male, never identified, exited and entered the residence. Forty minutes later, at 12:30 p.m., a black F-150 truck arrived at the residence, drove up the driveway as the garage door opened, and entered the garage as the garage door closed behind the vehicle. Task Force Officer Purvines could not clearly see the two occupants of the truck due to the dark tinted windows.

After approximately eight minutes, a Hispanic male, later identified as Defendant Camacho-Pineda ("Camacho"), exited the residence, entered the BMW, and drove out of the subdivision to a nearby Walgreens, where he parked the BMW. Surveillance agents were also parked in the Walgreens parking lot and observed Defendant Camacho sitting in his car, looking around. Defendant Camacho then moved the BMW to another part of the parking lot, remained in his car, and continued looking around. The agents determined that

3

Defendant Camacho was conducting counterifesurveillance, looking for any police presence entering or exiting the subdivision.

At 12:40 p.m., the garage door to the residence opened and the F-150 backed out and left the subdivision. Task Force Officer Purvines directed other agents to follow the truck, and Georgia State Patrol troopers, who were staged nearby to assist, were asked to conduct a traffic stop of the F-150 because all of the observations "led agents to believe that this was a classic pick-up – drop off of narcotics and pick up by a secondary individual [and that] . . . a transaction had occurred." Tr., D.E. [115], at 38. At 12:45 p.m., the orange Yukon departed the residence, and a minute later the gray BMW returned, the garage door opened, the BMW entered the garage and the garage door closed, leading agents to believe the drug transaction had been completed.

Corporal Charles Chapeau and Trooper Rick Barber were the Georgia State Patrol officers assisting the DEA on December 3, 2010. Initially, the troopers were stationed in the area to be uniform presence at a residence where they understood the DEA was obtaining a search warrant. When the F-150 left the residence, however, DEA asked the troopers to follow and develop probable cause to conduct a traffic stop. Corporal Chapeau testified that it was his understanding that drugs were what they were looking for. While following the vehicle, both troopers observed that its windows were tinted too dark and neither trooper

4

could see the driver. At approximately 12:54 p.m., Trooper Barber initiated a traffic stop of the F-150, and Corporal Chapeau was his back-up.

Trooper Barber exited the patrol car and approached the passenger side of the F-150, which was stopped on the shoulder of I-85 southbound, speaking to the occupants, Defendant Crowell, the driver, and Defendant Willis, the passenger. He advised them that he had stopped them for a window tint violation and because he could not be sure that they had been wearing seat belts. Using a device to check the window tint, Trooper Barber confirmed within a couple minutes of pulling the F-150 over that the tint was darker than the legal limit. He asked Defendant Crowell for his driver's license and questioned him about ownership of the truck. Defendant responded that his brother owned the truck and had for a couple of years. Trooper Barber asked Defendant Crowell to exit the vehicle so that he could issue a warning and let him go on his way. While standing in front of the patrol car, Trooper Barber patted Defendant down for weapons and then entered his patrol car to start the computer checks on Defendant's driver's license and criminal history and to write the warning.

During this time, Corporal Chapeau spoke with Defendants and obtained Defendant Willis's driver's license. He asked Defendant Willis where she was coming from and going to. She responded that they had traveled up from Columbus to visit her mother, who had just been released from jail, to try to get her settled in an apartment. Corporal Chapeau also

5

spoke with Defendant Crowell and asked him the same question about their travel. Defendant Crowell stated that they had traveled up from Columbus to visit a friend and had just left a house. The inconsistent travel information heightened the officer' suspicions. He also noted that Defendant Crowell was fidgety and moving around a lot and that his nervousness did not seem to subside throughout the traffic stop, as it does during ordinary citizen-police encounters.

At approximately six minutes into the traffic stop, Trooper Barber exited his patrol vehicle and spoke with Defendant Crowell about his travel. Defendant stated that they had traveled up from Columbus that morning and visited a friend of his girlfriend's at a house, but that he did not know the name of that person or the location of the house. Corporal Chapeau then handed Trooper Barber Defendant Willis's driver's license, and Trooper Barber re-entered his patrol vehicle. At approximately nine minutes into the stop, Trooper Barber exited his vehicle and walked up to the cab of the F-150 where he verified that the VIN number on the insurance card matched the VIN number on the truck, and he asked Defendant Willis to verify her identity and the address on her driver's license and checked to be sure that she was okay. He also asked her about her travel, to which she responded that they had gone to visit her mother who had just been released from prison and was moving into an apartment. They had visited her at an apartment complex. Trooper Barber also noticed that Defendant Willis looked straight ahead and did not make eye contact as he

spoke with her. He then asked Defendant Crowell if he had visited a house or an apartment, and Defendant responded a house, indicating to the trooper that Defendant was not confused about his travel story.

Trooper Barber returned to his patrol vehicle to finish running the record checks, including Defendant Willis's, and to print out a warning and consent to search form for the F-150. At approximately 14 minutes into the stop, Trooper Barber exited his vehicle and walked up to the cab of the truck to return to Defendant Willis her driver's license and then to speak with Defendant Crowell. He handed back Defendant's driver's license and the insurance card and explained the warning for the window tint violation. At this point, according to the officers, the traffic stop was completed; Defendants were free to leave; and the trooper began a consensual conversation with Defendant Crowell.

Trooper Barber continued talking with Defendant because he believed that further investigation was appropriate based on the totality of the circumstances, which included the fact that the truck had just left a residence where the DEA was going to execute a search warrant looking for either drugs or a large amount of money; Defendants had provided inconsistent travel stories; Defendants had a suspiciously quick turn around time for the trip, approximately two hours each way, from Columbus that morning and returning in the early afternoon; and because of Defendants' nervous behavior. Trooper Barber asked Defendant if there was anything illegal in the truck, and according to the trooper, received quick "no's"

7

in response until he asked if there was cocaine in the truck. At that point, Trooper Barber said that the Defendant looked down and to the right, digging into his pocket to pull out an item, which the trooper thought was currency, as Defendant said something to the effect, "No, all I have is this. . . ." Tr., D.E. [115-116], at 224-25, 273-75. Trooper Barber testified that he thought Defendant was being deceptive in his answer. *Id.* at 225. Using the consent to search form, the trooper then asked Defendant if he could search his truck. Defendant consented and signed the form.

After asking Defendant Willis to exit and stand back by the patrol car, Trooper Barber began searching the vehicle, while Corporal Chapeau remained with the Defendants. Shortly after the search began, Defendant Willis stated that she needed to use the bathroom, and after approximately nine minutes, Defendant Crowell stated that he was ready to go. Corporal Chapeau then asked Defendant Crowell if he was withdrawing his consent to the search, and Defendant Crowell replied that he was. Corporal Chapeau then immediately told Trooper Barber to stop the search and retrieve his K-9 to deploy around the F-150, and the trooper complied. Corporal Chapeau decided to use the K-9 based on the same factors underlying the decision to ask for consent to search. At this point, neither Defendant was free to leave.

Within a minute or so, Trooper Barber retrieved the K-9 and moved him up to the front passenger side of the F-150 to present the vehicle to the dog. Trooper Barber testified

that he was trained to continue moving his hand in a V pattern up and down as the K-9 sniffs to catch odors from inside the truck. As the K-9 went around the front of the truck, Trooper Barber stated that the K-9 alerted, that is, he sat, at the front passenger side door – the area between the door and front fender. After circling the truck, Trooper Barber returned the K-9 to his patrol vehicle and then continued searching the F-150. Trooper Barber resumed the search by checking voids or locations where compartments could hold drugs. He checked the gas tank cap, looked in the bed of the truck, underneath the truck, and then re-entered the passenger compartment of the truck from the passenger side. He looked again under the truck and in the wheel well areas at the back of the truck. Trooper Barber next re-entered the passenger compartment before exiting the truck to retrieve a tool bag from his patrol vehicle. This occurred at about 40 minutes into the traffic stop. Trooper Barber testified that when he examined the console in the passenger compartment, he observed that the screws had been tampered with as if "tooled," that is, the black paint on the screws was worn off as if removed a number of times. Trooper Barber testified that this was highly unusual, so he retrieved a screw driver to open the console. When he opened the console, the trooper observed four kilograms of cocaine located inside an area that had been modified to hold the drugs. This occurred at approximately 45 minutes into the traffic stop. The Defendants were then placed under arrest, and the DEA agents were notified immediately of the cocaine that was discovered.

9

While the Georgia State Troopers were engaged with Defendants Crowell and Willis, Task Force Officer Purvines testified that back at 1242 Bailing Drive he was advised over the radio that the orange Yukon, which left the residence just after the F-150, was observed on I-85 passing the scene of the F-150 traffic stop. Approximately two to three minutes later, at 1:10 p.m., the garage door opened and the gray BMW left the residence at "a high rate of speed." Tr., D.E. [115], at 70. Because no one else was present, Task Force Officer Purvines followed the BMW and pulled behind the vehicle at a stop sign. At that point, Purvines observed passengers in the BMW turning around and looking at him, indicating that the BMW's occupants knew he was following them.

The BMW then made a right hand turn onto McKendree Church Road, driving slowly, until reaching Riverside Parkway, where the BMW stopped and the occupants again turned to look back at Purvines. The vehicle made a right hand turn onto Riverside Parkway and again sped up. At the River Exchange Shopping Center, the BMW entered and made a series of turns to circle the shopping center before getting back on Riverside Parkway to continue in the same direction away from the Bailing Drive residence. This conduct, in conjunction with the occupants turning around to look at Purvines and the BMW speeding up and slowing down, indicated to him that Defendants were attempting to elude law enforcement. Purvines was then joined by other agents, and when they received word over the radio that four kilograms of cocaine had been found in the center console of the F-150,

10

they made the decision to stop the BMW and detain the occupants. Task Force Officer Purvines testified that the totality of the circumstances led him to believe that Defendants were involved in a drug transaction.

After the BMW was pulled over, the agents and task force officers first removed the driver, Defendant Gomez-Penaloza ("Gomez"), from the vehicle and patted him down for weapons and then handcuffed him before seating him on the curb. They found on Defendant Gomez's person his identification and approximately $9,000 in cash. Next, Defendant Sanchez was removed from the vehicle, also patted down for weapons, handcuffed and seated on the curb, and then Defendant Camacho was removed from the backseat, patted down for weapons, handcuffed and seated on the curb. From Defendant Sanchez's person, the agents seized approximately $2,000 in cash, two cellular telephones, and identification. The only item found on Defendant Camacho's person was his identification. The law enforcement officers also observed several cellular telephones in the BMW, but did not seize them at the time. The three cell phones were later seized pursuant to a DEA inventory search of the vehicle.

### B. The Report and Recommendation

Magistrate Judge King concluded in her R&R that all of Defendants' motions to suppress should be denied. Beginning with Defendant Crowell, Magistrate Judge King found that the Georgia State Troopers' initial traffic stop was not unreasonably prolonged

and that Defendant's subsequent detention after the consensual search was based on reasonable suspicion that Defendant was engaged in criminal conduct and that contraband was secreted in the F-150. Magistrate Judge King based her reasonable suspicion determination on the collective knowledge doctrine, looking at the totality of the information known collectively to all of the law enforcement personnel participating in the investigation and subsequent traffic stop of the F-150. Magistrate Judge King also rejected Defendant Crowell's challenges to the reliability of the K-9 alert and to the credibility of the troopers regarding their testimony about the K-9 alert, and found that the K-9 alert, especially when considered in light of all the other information known collectively to law enforcement, provided probable cause for the interior search of the F-150, including the center console.

Next, Magistrate Judge King concluded that certain statements made by Defendant Willis during the traffic stop were admissible because Defendant Willis was not subjected to custodial interrogation during the stop and because nothing about the circumstances of the stop were coercive.

As to the stop of the BMW and arrests of Defendants Sanchez, Gomez, and Camacho, Magistrate Judge King found that the agents and task force officers had probable cause to believe that the occupants of the BMW were engaged in criminal activity – the drug transaction involving the four kilograms of cocaine found in the F-150 – at the time of the stop and Defendants' arrests. Magistrate Judge King also concluded that the later search of

12

the BMW, which yielded three cellular telephones, was a lawful search pursuant to the automobile exception or as an inventory search.

Defendants also sought to suppress a small amount of cocaine, a handgun, and ammunition seized during the execution of a federal search warrant at 1242 Bailing Drive. Magistrate Judge King rejected Defendants' challenge, however, finding that the supporting affidavit, which detailed the evidence leading to surveillance of 1242 Bailing Drive as well as the occurrences of that day, established a "fair probability" that evidence related to drug trafficking activity would be found inside the residence. Alternatively, Magistrate Judge King found that even if the affidavit did not establish probable cause, the good faith exception to the exclusionary rule should be applied in this case.

Finally, Magistrate Judge King recommends that this court deny Defendant Crowell's motion for severance because Defendant has failed to establish that severance is required based on his claims of prejudice.

## II. Discussion

### A. Defendants Camacho and Willis

Pursuant to Rule 59 of the Federal Rules of Criminal Procedure, Defendants may, within 14 days, "serve and file specific written objections to the proposed findings and recommendation." Fed. R. Crim. P. 59(b)(2). "Failure to object in accordance with this rule waives a party's right to review." *Id.* Because Defendants Camacho and Willis have failed

AO 72A
(Rev.8/82)

to object to Magistrate Judge King's Report and Recommendation, they have both waived their right to review. Thus, the court ADOPTS the Report and Recommendation regarding Defendants Camacho and Willis as the ORDER of the court. The court DENIES Defendants' motions to suppress [64], [70], [108], and [129].

### B. Defendants Sanchez and Gomez

Magistrate Judge King issued her R&R on November 28, 2011, and Defendant Sanchez filed what he styles as objections on March 6, 2012, long after the 14-day deadline provided for by Rule 59. Moreover, in his filing, Defendant Sanchez merely states that he "objects to both the factual and legal conclusions made in the R&R" because "he believes his 4th Amendment rights were violated." Sanchez's Objections, D.E. [146], at 2. Defendant Sanchez also purports to "specifically incorporate[] by reference the facts and law cited in his earlier motions and brief." *Id.* Defendant Gomez's "objections," although timely, are nearly identical.[1]

Defendants make no attempt to specify why they disagree with the magistrate judge's conclusions. "In order to trigger *de novo* review of an R&R, the objection must be 'specific.'" *United States v. Diaz*, No. 1:09-CR-0037-WBH, 2011 WL 344093, at *1 (Jan.

---

[1] The court also notes that Defendant Gomez requested in his objections a "four-week extension of time within which to brief the specific areas of concern within the R&R." Gomez's Objections, D.E. [145], at 1. Defendant Gomez made this request on December 12, 2011, however, and has not filed anything else on the docket as of the date of entry of this order.

31, 2011) (quoting Fed. R. Civ. P. 59(b)(2)). "General objections which reassert arguments by reference to prior pleadings do not suffice." *Id.* (citing *Nettles v. Wainwright*, 677 F.2d 404, 410 n. 8 (5th Cir. 1982). In the absence of objections filed in accordance with Rule 59(b)(2), this court need only perform plain error review. *Id.*

Having performed such a review, the court concludes that Magistrate Judge King's R&R is correct as to law and fact as it relates to Defendants Sanchez and Gomez and ADOPTS it as the ORDER of the court. The court DENIES Defendant Sanchez's motions to suppress [72], [86] and DENIES Defendant Gomez's motions to suppress [71], [87].

### C. Defendant Crowell

By contrast, Defendant Crowell has filed specific objections to Magistrate Judge King's R&R, and the court addresses each in turn.

### 1. Waiver

Defendant first argues that the Government waived any argument regarding the collective knowledge doctrine by failing to raise it before Magistrate Judge King, and therefore the magistrate judge erred in *sua sponte* analyzing and applying the doctrine. According to Defendant, the fact that the Government did not specifically assert in its post-hearing brief that the knowledge of the DEA agents should be imputed to Trooper Barber and Corporal Chapeau means that the government waived that claim.

15

Yet, as Defendant acknowledges, the Government did in fact use various pieces of evidence that were known only to the investigators conducting surveillance at 1242 Bailing Drive to support its position that Trooper Barber and Corporal Chapeau had reasonable suspicion sufficient to justify detaining Defendants after they withdrew their consent to the officers' initial search. The Government relied on information indicating that an individual named Beto was suspected of narcotics trafficking at 1242 Bailing Drive and the fact that Crowell and Willis had been inside the residence under circumstances that experienced drug investigators described as "classic" indicators of a "pick up – drop off of narcotics and pick up by a secondary individual." Thus, the Government at least implicitly relied upon the collective knowledge doctrine in its post-hearing brief. Moreover, when making the reasonable suspicion determination, courts routinely look to the collective knowledge of all officers involved in the traffic stop. *See United States v. Nunez*, 455 F.3d 1223, 1226 (11th Cir. 2006) ("Reasonable suspicion is determined from the totality of the circumstances and collective knowledge of the officers.") (citing *United States v. Acosta*, 363 F.3d 1141, 1145 (11th Cir. 2004)); *United States v. Glinton*, 154 F.3d 1245, 1257 (11th Cir. 1998) ("In *Williams*, 876 F.2d at 1524, the court observed that reasonable suspicion is determined by the *collective* knowledge of the officers involved in the stop. The fact that the task force officers who ordered the stop by radio had reasonable suspicion to believe Hatten was carrying drugs satisfies the *Terry* requirements for an investigative stop."); *United States v.*

16

*Rodriguez-Alejandro*, 664 F. Supp. 2d 1320, 1335 (N.D. Ga. 2009) (Thrash, J.) ("Where the investigative stop is performed by an officer at the direction of other officers, the Court must examine the collective knowledge of all of the officers in determining whether there existed reasonable suspicion."). And finally, even if the Government had not raised the issue at all in its briefing, this court still has discretion to consider an argument not presented to the magistrate judge. *See Stephens v. Tolbert*, 471 F.3d 1173, 1174 (11th Cir. 2004) (holding that a district court does not abuse its discretion by considering an argument that was not presented to the magistrate judge). The court finds that Defendant's waiver argument fails.

### 2. Application of Collective Knowledge Doctrine

Next, Defendant argues the collective knowledge doctrine does not apply because the agents conducting surveillance at 1242 Bailing Drive did not have reasonable articulable suspicion of criminal activity themselves. Defendant urges that where the DEA agents do not have the requisite reasonable suspicion, and they call other officers to request that they develop their own probable cause to make a traffic stop, it is nonsensical to impute the DEA agents' knowledge to the officers effectuating the stop. Defendant contends that the Georgia State Patrol troopers were not acting as agents of the other investigating officers, and as such they should be required to develop their own basis for suspicion at the scene and, absent such suspicion, Defendant should have been free to leave.

17

While Defendant may be correct that the collective knowledge doctrine does not apply where the officers requesting a stop do not have reasonable articulable suspicion themselves, the court need not address that question here because it finds that the investigators conducting surveillance at 1242 Bailing Drive did have reasonable suspicion sufficient to justify a *Terry* investigative stop. A reasonable suspicion is more than an "inchoate and unparticularized suspicion or hunch." *United States v. Powell*, 222 F.3d 913, 917 (11th Cir. 2000). Here, the investigating officers (1) suspected that 1242 Bailing Drive was a stash house for narcotics, based on information gathered from court-authorized wiretaps and trash pulls; (2) witnessed a gray BMW pull out of the garage and park in front of the house on the street; (2) witnessed an orange Yukon pull up and park in front of the BMW on the street; (3) watched the F-150 pull into the driveway and enter the garage, as the garage door closed behind it; (4) observed the BMW leave the house and park at a nearby Walgreens, conducting what the investigators suspected was countersurveillance; and finally (5) observed the F-150 leave after a short visit, while the gray BMW returned to the residence and again parked in the garage. While each fact alone may seem innocuous, the court must consider the totality of circumstances. *See United States v. Hunter*, 291 F.3d 1302, 1306 (11th Cir. 2002) ("In evaluating the totality of the circumstances in a given case, the court may not consider each fact in isolation."). Considering the totality of the circumstances, the court finds that the information that led the agents to 1242 Bailing Drive,

18

combined with the suspicious comings and goings at the residence, is sufficient to rise to the level of a reasonable articulable suspicion justifying a *Terry* stop. The agents reasonably concluded, based on their training and experience, that Defendants were conducting countesurveillance and that this was a "classic" case of a "pick up – drop off of narcotics and pick up by a secondary individual." Thus, Magistrate Judge King did not err in applying the collective knowledge doctrine.

Defendant then argues that even if the doctrine applies, there was no reasonable suspicion of criminal activity even if the collective knowledge of the DEA agents is considered along with the observations of the arresting officers. Given what the court found above, this argument clearly fails. The knowledge of the investigating officers imputed to Trooper Barber and Corporal Chapeau, combined with their observations during the traffic stop, is clearly sufficient to rise to the level of reasonable suspicion of criminal activity. Defendant attempts to minimize the Government's evidence by stating that the investigating agents' "simply observ[ed] an individual meet[] with a suspected drug dealer." Crowell's Objections, at 14. However, as the court explained above, considering the totality of the circumstances, the officers were justified in reasonably concluding that a drug transaction had just occurred at 1242 Bailing Drive involving the F-150, based upon more than just the F-150's arrival and quick departure.

AO 72A
(Rev.8/82)

### 3. Dissipation of reasonable suspicion

Finally, Defendant contends that any suspicions collectively or individually held by law enforcement dissipated after the nine-minute consensual search of the F-150, in which Trooper Barber found nothing suspicious. Defendant insists that at the moment he withdrew his consent to the search, the officers no longer had any reasonable articulable suspicion of criminal activity and Defendant should have been allowed to leave.[2]

The court does not find Defendant's argument persuasive. Considering the collective knowledge of all the law enforcement officers involved, the Georgia State Patrol troopers already had reasonable suspicion of criminal activity at the moment they initiated the traffic

---

[2] Defendant principally relies upon *United States v. Campbell*, 920 F.2d 793 (11th Cir. 1991) for support. The court finds, however, that *Campbell* is inapposite. In *Campbell*, police received information from a confidential informant regarding the delivery of approximately 150 pounds of marijuana. *Id.* at 794. When the truck described by the informant arrived at the expected location, agents approached the vehicle with their weapons drawn. *Id.* The defendants were all ordered out of the truck, searched and arrested. *Id.* At least one officer visually inspected the interior of the vehicle but found no contraband. *Id.* The truck and defendants were then taken to the police station. *Id.* The court found that the police did not have probable cause to arrest the defendant, much less search the vehicle when they first encountered it at the truck stop. *Id.* at 796-97. Defendant relies upon dicta in the opinion in which the court stated that after the officers searched the occupants and the vehicle at the truck stop, even any reasonable suspicion they may have had dissipated. *Id.* at 797. In our case, however, the totality of the circumstances are vastly different. Here, DEA agents were involved in a continuing investigation that led them to 1242 Bailing Drive, a suspected stash house; they observed various suspicious activities occur the day of the traffic stop; and the Georgia State Patrol troopers' reasonable suspicions were heightened by Defendants' behavior during the traffic stop. The nature of the seizure in this case is also completely different. Thus, the court does not find *Campbell* applicable to the facts at hand.

20

stop. That reasonable suspicion was only heightened by Defendants' behavior throughout the traffic stop, which included (1) Defendant Crowell's trembling hands and other indicators of nervousness, which according to the troopers' testimony did not subside throughout the duration of the stop, as is typical of most citizen-police encounters; (2) Defendant Willis's avoidance of eye contact; (3) Defendant Crowell and Willis's inconsistent travel stories; and (4) the suspiciously quick turnaround for the two-hour trip up from Columbus that morning. All of these factors raised the troopers' suspicions, justifying not only their request for consent to search the vehicle, but also the brief and minimally intrusive investigative technique employed once Defendant withdrew consent. *See United States v. Hardy*, 855 F.2d 753, 759 (11th Cir. 1988) (noting that a canine sniff is a brief and minimally intrusive investigative technique). Although the officers had searched the F-150 for nine minutes, the court does not find that the moment Defendant requested they stop the search was also the moment all reasonable suspicion dissipated. The troopers remained suspicious and were continuing to search the vehicle when Defendant requested that they stop. At that point, the troopers decided to take one final step to confirm or dispel their suspicions and did so in a minimally invasive and quick manner.

Moreover, the court is very reluctant to hold that Defendant's detention for less than three minutes rises to the level of a constitutional violation. *See United States v. Hernandez*, 418 F.3d 1206, 1212 n.7 (11th Cir. 2005) ("Even *if* seventeen minutes is some minutes

longer than the norm [for a traffic stop], we question whether the Fourth Amendment's prohibition of unreasonable seizures is concerned with such trifling amounts of time, when the seizure was caused at the outset by an apparent violation of the law. Of trifles the law does not concern itself: *De minimis non curat lex*. This ancient legal term seems especially pertinent when it is the Constitution that we are being asked to apply."). The Fourth Amendment is concerned with *unreasonable* searches and seizures, and based upon the totality of the circumstances here, it does not appear to the court that Defendant's detention for an additional three minutes while the officers performed an open air canine sniff was unreasonable and violative of the United States Constitution.

Finally, the court finds that *United States v. Terry*, 220 Fed. Appx. 961 (11th Cir. 2007) further supports its holding. There, after a lawful traffic stop, the defendant initially consented to a search of his vehicle. *Id.* at 964. The officer searched the interior of the defendant's car, but when he opened the trunk, the defendant withdrew his consent. *Id.* At that point, the officer testified that he immediately stopped the search. *United States v. Terry*, No. 5:05-cr-00058-WDO-CWH-1, M.D. Ga. Feb. 28, 2005, Docket Entry 54, at 5. The officer then told defendant he was going to issue a citation and perform a canine sweep of the vehicle, and if the dog did not "alert" to an odor in the car, the defendant could leave. *Terry*, 220 Fed. Appx. at 964. The dog "showed a very strong response on the trunk of the vehicle, and 'went in' the trunk and began 'showing his final alert on a red plastic bin.'" *Id.*

AO 72A
(Rev.8/82)

The officer then began to search the trunk of the vehicle and subsequently located five bricks of suspected cocaine and placed the defendant under arrest. *United States v. Terry*, No. 5:05-cr-00058-WDO-CWH-1, M.D. Ga. Feb. 28, 2005, Docket Entry 54, at 5. The defendant argued that after he withdrew his consent, the police officers improperly searched the vehicle by allowing the canine to freely sniff the air surrounding the opened trunk. *Id.* at 13. The district court rejected the defendant's argument, finding that the canine sniff was not a search within the meaning of the Fourth Amendment, and thus defendant's rights were not violated. *Id.* at 13-14. In a per curiam opinion, the Eleventh Circuit affirmed. *Terry*, 220 Fed. Appx. 961. Similarly, here, once Defendant withdrew consent, the officers performed a lawful canine sniff of the open air near Defendant's truck, the canine alerted, and the officers then had probable cause to perform a more thorough search of the F-150.[3]

---

[3] Defendant also lodges several factual objections to the R&R. First, Defendant argues that his and Defendant Willis's travel stories were not inconsistent because he could have been visiting a friend in a house while Willis could have been visiting her mother in an apartment. However, according to the trooper's testimony, both Defendants had stated that they, together, had come up to the Atlanta area for the reason given. R&R, at 40. There was no indication that they had different destinations in mind. Further, Defendant Crowell told Trooper Barber they were visiting a friend of his girlfriend's. Defendant Crowell also could not give the name of the friend he was supposedly visiting or the location of the house, making this version of events even less likely. *Id.*

Second, Defendant contends he was not nervous; that his hands were shaking, he was rubbing his hands together, and swaying back and forth because of the cold December temperatures that afternoon. Defendant urges that the traffic stop video supports his account. After reviewing the video, the court agrees that Defendant does not appear to be that nervous during the times he is visible on the police camera. Nonetheless, there are periods of time during the traffic stop that the court could not see Defendant as he stood to the right of the patrol vehicle. And, as the magistrate judge noted, whether Defendant's conduct was

### III. Conclusion

For the foregoing reasons, the court DENIES all of the defendants' motions to suppress [64] [68] [69] [70] [71] [72] [86] [87] [103] [108] [129], DENIES Defendant Crowell's motion for severance of Defendants [105], ADOPTS AS MODIFIED the Report and Recommendation of Magistrate Judge Janet F. King, and OVERRULES Defendant Crowell's Objections thereto [144], OVERRULES Defendant Isidro Gomez-Penzaloza's Objections thereto [145], and OVERRULES Defendant Humberto Sanchez-Tamayo's Objections thereto [146].

**IT IS SO ORDERED** this 23rd day of April, 2012.


_____S/   J. Owen Forrester_____
J. OWEN FORRESTER
SENIOR UNITED STATES DISTRICT JUDGE

---

unusual for a normal traffic stop is opinion evidence offered by the troopers. Thus, at best, the evidence here is conflicting, and the court is more likely to accept the testimony of the two arresting officers, whom the magistrate judge witnessed testify and found to be credible.

Lastly, Defendant contests whether or not the troopers knew what they were searching for when they pulled over Defendant's F-150. In her R&R, however, the magistrate judge accurately characterizes both troopers' testimony. Trooper Barber was unsure whether he was searching for drugs or money, while Corporal Chapeau testified that it was his understanding that they were looking for drugs. Thus, the court does not find error in the facts as recited by Magistrate Judge King in her R&R.

AO 72A
(Rev.8/82)